**Manuel Lee RUNNELS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–76–555.**

Court of Criminal Appeals of Oklahoma.

April 8, 1977.

Rehearing Denied April 26, 1977.

Don Anderson, Public Defender, Oklahoma County, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Eric Warner, Legal Intern, for appellee.

## OPINION

BLISS, Judge.

Appellant, Manuel Lee Runnels, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Oklahoma County, Case No. CRF–74–3825, for the offense of Rape in the First Degree, After Former Conviction of a Felony, in violation of 21 O.S.1971, § 1111. In accordance with the jury's verdict, punishment was fixed at sixty-three (63) years' imprisonment. From said judgment and sentence, an appeal has been filed with this Court.

The victim, a 14-year-old girl who was in the ninth grade, testified that on the evening of November 5, 1974, she was visiting the home of a girl friend, Vickie Hamilton. Others present included Miss Hamilton's brother, Fonzell, her mother, the defendant, Emma Phillips, with whom the defendant was living, and Ms. Phillips' baby. As the visitors were preparing to leave, Fonzell Hamilton's mother agreed to let him drive the defendant, Ms. Phillips and her baby home. The victim decided to ride with them and to walk to her house from the defendant's home.

After Hamilton let them out at the defendant's home and left, Ms. Phillips discovered she had left the baby's milk at the Hamilton residence. The defendant called Hamilton's mother, who sent her son back with the milk. The victim accepted Hamilton's offer for a ride to her home. The defendant accompanied them. At the defendant's request Hamilton stopped the car in a church parking lot.

On cross-examination the victim admitted that the group smoked marihuana. The defendant began "messing with his pants" and grabbed the victim, but let her go when she tried to bite his shoulder. The defendant made threatening gestures toward the victim with his fist. The victim asked Hamilton to protect her, but the defendant warned her that "I could kill my mama if she was to hit me right now because you bit me." Defendant continued to threaten the victim, telling her, "Either you going to have to give up something now to me, or Fonzell," and, "If you have sex with Fonzell I won't jump on you," and, "you'll have to have sex with me or Fonzell."

The victim agreed to sexual relations with Hamilton. The defendant got into the back of the car while Hamilton made sexual advances to the victim, who resisted his efforts. When Hamilton told the defendant that the victim was "not doing right" the defendant ordered Hamilton away from her. The defendant then began making sexual advances toward the victim, who told him in explicit language she would not have sexual relations.

The defendant forced the victim into the back of the car where she continued to resist the defendant's advances despite being choked. Hamilton began driving the car, and defendant directed him to drive through an alley. As the car slowed in preparation to turn into the alley the victim escaped from the car and ran to the nearby home of an acquaintance, who was apparently away. Defendant caught the victim and forced her under threat of death to accompany him as he ran through the neighborhood, despite her pleadings and those of Hamilton and one Warren Jackson, who had been attracted by the noise. The defendant managed to elude Hamilton and Jackson prior to reaching his home where he forced the victim to get into a station wagon, forced her to strip below the waist and forced her to have sexual intercourse with him.

The defendant refused to allow the victim to go to her home, but made her spend the night in his home, where she slept in the bedroom with Ms. Phillips and the baby. The next morning the victim talked briefly with Ms. Phillips, but did not tell of the rape. The victim went to her aunt's house and from there to school. Subsequently, the victim's mother informed the police of the attack.

On cross-examination the victim said she had taken one puff of one marihuana cigarette while the car was parked at the church. She also admitted having spent a previous night in the defendant's home with a girl friend, Antoinette Johnson. She denied having testified at an earlier hearing that she had told a girl named Nancy Jones about the incident, and further denied knowing anyone named Nancy Jones. She admitted having sexual intercourse with her 17-year-old boyfriend.[1]

On redirect, the victim testified she had sexual intercourse with her boyfriend only once or twice and with no one else.

On recross examination she testified that she had not engaged in sexual intercourse prior to the incident, but had sexual relations with her boyfriend two or three weeks afterwards.

Dr. John Hamilton, a resident physician in gynecology and obstetrics, testified that he examined the victim at approximately 3:30 p. m. on November 6, 1974. He took scrapings of the victim's cervix and vagina and prepared two permanent sections which were sent to the Oklahoma State Bureau of Investigation. He also examined another slide which he had prepared, but was unable to detect any sperm.

Fonzell Hamilton, a 16-year-old in the eleventh grade, generally corroborated the victim's testimony, except that he admitted partial penetration during his attempt at sexual intercourse. He estimated that the victim had taken a total of eight puffs on two marihuana cigarettes.

Kenneth Jacobson, an officer with the Oklahoma City Police Department, testified he took the victim's statement in connection with the alleged rape attempt.

Ann G. Reed, a forensic chemist, testified that she examined two vaginal slides on November 25, 1974, and found traces of sperm. She estimated sperm could be present following sexual intercourse for as long as 72 hours.

Fonzell Hamilton was recalled and testified that he did not achieve an emission with the victim.

The victim was recalled and testified that the defendant had achieved a climax with her when they had sexual intercourse. She admitted to prior sexual relations.[2]

The State then rested. The defendant demurred to the evidence, but was overruled.

Emma Phillips testified for the defendant and generally corroborated the victim's testimony of the events up to the time the defendant, the victim and Hamilton left to take the victim home. She was asleep when the defendant and victim returned, but knew that the victim had slept in the same bed as she. Ms. Phillips testified that the victim and the victim's boyfriend had spent the night with the defendant and herself three nights prior to the attack. At

1. "Q. [By defense counsel]: Do you remember the time when you had intercourse with David?
"A. No.
"Q. Do you remember the time with respect to this incident you've been talking about, how long before?
"A. How long before I had intercourse with David?
"Q. Yeah, how long was that before you had this experience with Manuel?
"A. Well, before that I didn't have intercourse with David.
"Q. You mean you've had intercourse with David after this happened? Is that what you mean?
"A. Uh huh.
"Q. Don't you recall on the previous hearing in this case you testified that you had intercourse with David before this?

"A. Huh huh. He asked me the same thing you just asked me.
"Q. Now, you're saying that after this experience on this particular night you had intercourse a couple of time[s] with David?
"A. Now, after this had happened, about two or three weeks later.
"Q. Two or three weeks later?
"A. Two or three.
"Q. And that's the first time you'd had intercourse with David?
"A. Yes."

2. After the victim testified on direct examination that the defendant had an emission during the rape, the following exchange took place between defense counsel and the victim:
"Q. [By defense counsel]: How do you know? Have you had intercourse before?
"A. Yes."

that time, she stated, the victim had sexual intercourse with her boyfriend in the same room in which Ms. Phillips slept with the defendant.

On cross-examination Ms. Phillips admitted that she was unmarried and living with the defendant at the time of the alleged attack. She did not know if the defendant had raped the victim. She said the victim and her boyfriend had sexual relations on several occasions at the defendant's house.

The defense rested.

The State recalled the victim in rebuttal. She admitted spending a night at defendant's house approximately one week before he had attacked her. On cross-examination she admitted having had sexual intercourse with her boyfriend at the defendant's house approximately one week prior to the attack.[3]

## I

The first assignment of error is that the defendant was denied due process of law as the result of the victim's inconsistent and contradictory testimony. In support of this contention, we are cited several cases in which the United States Supreme Court has reversed convictions based upon perjured testimony and false evidence. An examination of these cases establishes that they are distinguishable from the case at bar and not applicable.

In *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), a key witness for the State in a murder trial, who previously had been convicted for his part in the murder and received a 199 year sentence, falsely denied having received any promise of consideration in exchange for his testimony. The assistant state's attorney, who had promised to help the witness only if his story about being a reluctant participant proved true, made no attempt to correct the

testimony. After serving many years of his sentence, the defendant discovered the falsity of the witness' denial and filed an application for post conviction relief.

The United States Supreme Court found the defendant had been denied due process because the State had failed to correct the testimony which it knew to be false. The Supreme Court cited with approval a New York Court of Appeals case, *People v. Savvides*, 1 N.Y.2d 554, 557, 154 N.Y.S.2d 885, 887, 136 N.E.2d 853, 854–855 (1956), which held:

> " 'It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct *what he knows* to be false and elicit the truth. * * * That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.' " (Emphasis added)

In *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967), an Illinois rape case, the key to the State's case was a pair of men's undershorts which had reddish stains alleged to have been blood from the slain 8-year-old victim. The defense was denied permission to conduct its own independent tests on the shorts. The prosecutor made many references to the "bloody shorts" and their circumstantial link of the defendant with the crime. In a subsequent habeas corpus action, new tests were made of the stains, which proved to be not blood but paint.

In granting the defendant's writ, the United States Supreme Court found the prosecutor, whom the State of Illinois con-

---

**3.** After the victim admitted on direct examination that she had spent a night at the defendant's house approximately one week prior to the rape, the following exchange took place between defense counsel and the victim:

"Q. [By defense counsel]: Did you stay there with David?

"A. Yes.
"Q. Did you sleep with him?
"A. Yes.
"Q. Did you have intercourse with him?
"A. Yes.
"Q. And you say it was about a week before?
"A. Yeah."

ceded knew during the trial that the stains were not from blood, had consistently and repeatedly misrepresented the nature of the "evidence" to exploit the "emotional impact" of an "important link in the chain of circumstantial evidence . . ." *Id.* at 386 U.S. 4–5, at 87 S.Ct. 787. Such prosecutorial misconduct was a violation of the Due Process Clause of the Fourteenth Amendment which "cannot tolerate a state criminal conviction obtained by the knowing use of false evidence." *Id.* at 386 U.S. 7, at 87 S.Ct. 788. Accord, *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

In *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), defendant's alleged co-conspirator was promised immunity from prosecution by an assistant United States attorney prior to testifying before the grand jury against the defendant. At trial, another assistant United States attorney prosecuted defendant and allegedly did not know of the prior commitment. The co-conspirator, whose testimony was essential to the defendant's conviction, denied he was promised anything in exchange for his testimony. The prosecutor did not correct the witness.

In reversing the conviction the Supreme Court held that "whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity . . . A promise made by one attorney must be attributed, for these purposes, to the Government." *Id.* 405 U.S. at 154, 92 S.Ct. at 766.

From our review of the above cases, it seems to this Court that a three-pronged test is used by the United States Supreme Court to determine if a defendant has been denied due process of law: (1) The status of a key part (witness or evidence) of the State's case was presented at trial with an element affecting its credibility intentionally concealed. (2) The prosecutor knew or

had reason to know of the concealment and failed to bring the concealment to the attention of the trial court. (3) The trier of fact was unable properly to evaluate the case against the defendant as a result of the concealment.

■ Applying the above test to the facts in the case at bar, it becomes obvious that the defendant was not denied due process. There is no doubt that the testimony of the victim—undeniably the key element in this case—was inconsistent and contradictory. She either had sexual intercourse with her boyfriend prior to being raped by the defendant, or she did not. It is fundamental that the testimony of a witness may be discredited by contradictions and inconsistencies. *Menefee v. State,* 97 Okl.Cr. 149, 260 P.2d 413 (1953).

Even assuming, *arguendo,* that the victim's claim of chastity at the time of the rape was false, there is absolutely no evidence before this Court to show that the prosecutor knew or had reason to know that the victim's testimony was false at the time it was given. In any event, defense counsel more than adequately called the inconsistencies and contradictions within the victim's testimony to the jury's attention.[4] The trier of fact was free to decide for itself the importance of the inconsistencies and contradictions in relation to the rest of her testimony.

Due process does not require that this Court substitute its judgment for that of the trier of fact if all the issues within the case have been properly presented during the trial for consideration. Therefore, we find the first assignment of error to be without merit.

## II

■ The final assignment of error is that the prosecutor improperly directed the

---

4. During closing argument, defense counsel stated:

"And that's another thing, yesterday when she testified she said she had not had intercourse with anybody previous to the incident she de-

scribed with Manuel. This morning she admitted she did. The only value of that is to prove that you just can't depend on what she says. That's the only reason I brought it out."

jury's attention to the failure of the defendant to testify. A careful review of the record discloses at least one comment[5] by the prosecutor directing the attention of the jury to the defendant's failure to testify in violation of the rule announced in *Hanf v. State,* Okl.Cr., 560 P.2d 207 (1977). Moreover, in considering the nature of the case at bar, and the evidence before the jury, we feel that a significant portion of the prosecutor's closing argument, when taken as a whole,[6] improperly emphasized the defendant's failure to testify. *Hanf v. State,* supra. However, defense counsel waived the error by failing to object to the comments at any time and by failing to move for a mistrial.

 In opposition to this assignment of error, the State cites several cases in which this Court found no error in statements similar to those in the case at bar. It serves no purpose to discuss such cases here. The rule in Oklahoma is settled. It is error for the prosecutor to comment—either directly or indirectly, at any stage of the jury trial—upon a defendant's right to remain silent. Defense counsel must preserve the error by timely objecting to the comment and moving for a mistrial, the only remedy available since an admonishment to the jury would only compound the error. *Hanf v. State, supra.* To the extent that *any* prior case decided by this Court is inconsistent with the above rule, it is specifically overruled.

For all of the above and foregoing reasons, the judgment and sentence herein appealed, is *AFFIRMED.*

BUSSEY, P. J., and BRETT, J., concur.

---

5. "[By the prosecution]: If *he* didn't choke her three times there would be some evidence *by the defendant* to rebut it." (Emphasis added)

6. During his closing argument, the prosecutor made the following comments, any one of which would require reversing the conviction here appealed if the error had not been waived. "And I submit to you that if *he*—that *if the defendant did not* rape this prosecuting witness, *there would be some evidence to rebut it.* There would be some evidence to rebut it. If he didn't hit her there would be some evidence today by the defense to rebut it. If he didn't choke her three times there would be some evidence *by the defendant* to rebut it. Did you hear any? Not one bit, not one bit, didn't hear a bit.

". . . If it wasn't true there would be *testimony here to say that he* did not rape her. There would be testimony here to say that he didn't hit her. There would be *testimony here to say that he* didn't hit her. There would be *testimony here to say that he* didn't strike her and there would be *testimony to show that he* didn't tear her blouse.
* * *
"So when you go to your jury room think in your mind, please, *why wasn't there some testimony refuting this. Why wasn't there?* . .

". . . And she's laying down there in the seat *by this defendant. Is there any testimony to refute that? No, not one.*" (Emphasis added)