(No. 56259.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. AMIL T. CORNILLE, Appellant.

*Opinion filed April 13, 1983.*

Charles E. Schmidt, of Mitchell, Brandon & Schmidt, of Carbondale, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield (Ellen M. Flaum and Terence M. Madsen, Assistant Attorneys General, of Chicago, and David Kluever, law student, of counsel), for the People.

JUSTICE SIMON delivered the opinion of the court:

The principal issue in this appeal is whether a defendant in a criminal trial is denied due process of law when an expert witness for the State later turns out to be an imposter who presented false testimony about his expert qualifications. We conclude that false testimony of this type violates due process and that a defendant convicted because of it is entitled to a new trial.

Following his conviction of arson in the circuit court of Williamson County, the defendant, Amil T. Cornille,

filed a petition seeking post-conviction relief alleging that he had been convicted on the basis of false testimony of this type. After a hearing, the circuit court decided that the testimony in question was false, but denied the petition. The appellate court affirmed in an unpublished Rule 23 order (102 Ill. App. 3d 1209). We allowed Cornille's petition for leave to appeal.

Nearly two years after the Cornille arson trial a reporter employed by a Chicago daily newspaper interviewed Dennis Michaelson, a consultant in fire investigations who had given crucial testimony for the State at that trial. Mr. Michaelson admitted in the interview that he had lied about his credentials as an arson-investigating expert when testifying at that trial as well as at other arson trials. After publication of the story based upon this interview the authorities began investigating Michaelson's academic and professional qualifications. These investigations established that Michaelson had given false testimony in several criminal arson trials, including Cornille's. Charges of perjury were thereafter filed by information against Michaelson in Boone, Cook and Williamson counties. Cornille's petition for post-conviction relief, which is the subject of this appeal, is based upon Michaelson's false testimony concerning his credentials as an expert witness. To understand the import of Michaelson's testimony it is necessary to review the record of Amil Cornille's trial.

Cornille was charged with committing arson on April 3, 1977, in that he knowingly damaged his home by means of fire with intent to defraud his fire insurance carrier. At trial he testified that on the evening of the fire he was watching television in the living room of his home in Johnston City. A daughter, who was ill, was sleeping on a couch in the same room. His wife and his two other children were away from home, attending religious services.

Shortly before 7:30 p.m., the television and the lights went out and Cornille heard a "crackling and popping" sound. He went to the circuit breaker box in the closet of an adjoining bedroom and placed his hand on it in the dark. Unable to detect any irregularity, but fearful for the safety of his daughter, he awakened her. After exiting with her through the front door, Cornille went to the rear of the house. He looked into the kitchen through the back door, saw flames under the refrigerator, and notified the fire department.

A fireman who arrived at the scene shortly afterward testified that "[t]he fire was in the kitchen area in the rear of the house. The cabinets were involved, the refrigerator was involved and the ceiling was partially involved." The fire was concentrated on the floor underneath the refrigerator and on the wall behind it, although there were also spot fires in the basement and the attic. After a few minutes the fires were put out and the fire damage was inspected. At the location of the refrigerator, a hole had been burned in the floor through which the basement could be seen. A sizeable wooden floor joist which could be seen in the middle of the hole was charred on the top portion only. The wall behind the refrigerator and the surrounding cabinets were also burned. The ceiling above the refrigerator was slightly singed.

Expert witnesses presented by the parties were in sharp disagreement about the cause of the fire. The State's theory was that Cornille had set the fire with gasoline, while the theory advanced by Cornille was that the blaze was caused by faulty wiring.

Officials of the Johnston City fire department and investigators for the defendant's fire insurance carrier testified for the prosecution that they had found no evidence of "beading" or "fusing" on electrical wires in the kitchen area. They stated that these conditions usually

are found when a fire is caused by an electrical malfunction. Moreover, the prosecution's experts testified that there was evidence of "alligator charring" on the floor joist, a pattern which often indicates a rapidly burning fire fueled by accelerants. They also observed that the fire had burned through the floor in a downward direction, a highly unusual circumstance when a fire is not fueled by accelerants.

Mr. Michaelson turned out to be an impressive prosecution witness. In presenting his credentials to the jury, he testified that he had investigated over 1,300 fires in 14 years as a fire investigator; that he had taught numerous seminars and courses for State and local governments on fire-investigation techniques; that he had written extensively in the field; and that he had designed several patented devices for use in fire investigations. In particular, he claimed credit for designing vastly improved equipment for testing samples by the technique of gas chromatography. This equipment allegedly was better able to detect the presence of accelerants than more traditional devices.

In addition to these self-proclaimed professional accomplishments Michaelson offered the following testimony as to his academic qualifications in response to questions by the prosecutor:

"Q. Mr. Michaelson, do you hold any degrees from universities or institutions of higher education?

A. Yes.

Q. And what are those degrees and where were they obtained?

A. I have an associate degree from Wright College in Chicago, I also have a degree, Bachelor's Degree in Science from Illinois School of Technology, and in addition to that I have about 25 credit hours, post-graduate courses, such as physics, optics and other courses I felt were of interest personally to me or usefulness in my work.

Q. In your degree in Science, was that chemistry?

A. In chemistry, yes, sir."

Some of Michaelson's substantive testimony was the same as that of the other prosecution witnesses; he noted the "alligator charring" and the downward burning pattern of the fire and observed that they indicated the possibility of an accelerant-fueled fire. The balance of Michaelson's testimony, however, was extremely significant, for it provided the crucial link in the prosecution's case: the accelerant. Michaelson testified that he had taken two samples from the carpeting near the hole in the floor and one sample from the exposed floor joist. He had tested these samples for the presence of accelerants by the use of what he claimed was his special gas chromatography equipment. He determined that the two pieces of carpeting contained traces of gasoline and that the floor joist contained traces of a petroleum distillate which might have been gasoline. On the basis of his test results, not only Michaelson, but the other expert witnesses for the prosecution as well, concluded that the fire was of an incendiary nature and probably caused by gasoline.

The defendant presented expert testimony that substantially contradicted the prosecution's theory of an incendiary fire. An arson investigator for the State fire marshal testified that he had collected three samples of debris at the scene of the fire, one of which was from the floorboards at the edge of the hole caused by the fire. The investigator took these samples to the Illinois Bureau of Scientific Services in DeSoto, Illinois. A forensic scientist at the Bureau testified that he tested the samples for the presence of accelerants using a gas chromatography technique and determined that the samples contained no traces of accelerants.

The defendant also presented substantial testimony in support of his theory of an electrical fire. He testified that he had purchased the house in February 1977 and from the very beginning the family had experienced electrical problems. The lights and television would flicker off and on

whenever the family plugged in electrical appliances. This was corroborated by the testimony of guests at the Cornille residence. Two electric company employees who inspected the home shortly before the fire testified that the electricity meter was broken and that the circuit breaker box was improperly installed.

An electrical contractor and an electrical engineer who inspected the electrical system in November 1977, seven months after the fire, both testified that the wiring in the house fell far short of the requirements of local electrical codes. One observed that "this was the worst wired house I had ever seen." The electrical receptacles in the kitchen, including the one used by the refrigerator, were screwed directly into the wood paneling and did not have a metal box housing the open connections. The house was wired with telephone hookup wire which is neither voltage nor current rated, and according to these witnesses, the small and improperly insulated wire could have easily overheated and caused a fire. They also testified that wire splices were not properly housed in a junction box or joined with scotch lock. Moreover, the house had an inadequate 30-amp circuit breaker on the refrigerator's electrical receptacle rather than the customary 15- or 20-amp circuit breaker.

The electrical engineer testified that the downward burn pattern of the fire was not impossible for an electrical fire. He also observed that "beading" and "fusing" do not occur in all electrical fires. He offered his opinion that the wiring defects were the most likely cause of the fire:

> "With the 30 amp breakers and the very small wire there is a very good possibility, very good possibility, that they had low voltage in the house. And low voltage also means that you demand more current which makes things run hotter. And [the cause] of that extra heat and the low voltage was in [turn] because of the small wire, I would guess that they played an important part in this whole fire.
>     * * *

*** I will say that it was *** this very poor wiring system that *** was the cause of the fire. In fact, it *** was so bad that it is like driving *** a car without brakes. If you keep driving that car you will have an accident. And that house was headed for a fire one time or the other. So, I come to the conclusion this could very well have been the time. The location of the fire was at this receptacle. The fire was underneath the refrigerator, every evidence was there. There was low voltage under the refrigerator which means the thing was running hot."

The prosecutor recognized that the outcome of the case turned on which experts the jury believed when he noted in his closing argument that "[s]ometimes trials like this boil down to *** disputes between experts. Unfortunately, this one maybe has." In his closing argument the prosecutor referred at least three times to Michaelson's testimony. He encouraged the jury to believe that testimony by emphasizing Michaelson's impressive credentials:

"[The defendant's attorney] asked Mr. Michaelson if he was getting paid for coming down and seeing this. Of course, he was, ladies and gentlemen. Of course he was. He is a professional. He gets paid to come and investigate fires. Completely investigate fires. *** Do you think he is going to lie? Do you think he is going to come up with results just because he wants to continue or he wants to get more jobs with the insurance company? What sort of credibility does he have then? What good does it do to investigate fires if every time he comes into Court it is shown on a prior occasion that he lied. About a prior fire. He has got his professional reputation at stake. And he is an expert. In fires. You heard his credentials. *** You decide what weight is to be given to his testimony."

The defendant received a sentence of five years. The appellate court affirmed the conviction in an unpublished Rule 23 order, and the defendant began serving his sentence.

Cornille's petition for post-conviction relief alleged that, as a result of Michaelson's false testimony at the arson

trial, Cornille "was substantially denied due process guaranteed him in the Fourteenth Amendment of the Constitution of the United States and in Article I, Section 2, of the Constitution of the State of Illinois." In support of this petition the defendant presented an affidavit of Lynn Emmerman, the newspaper reporter who interviewed Michaelson and heard him admit to testifying falsely about his professional credentials at the Cornille trial. The record also contains a copy of the Williamson County information which charges:

> "DENNIS MICHAELSON committed the offense of PERJURY in that said defendant *** under oath or affirmation in a criminal proceeding ***, *People v. Cornille*, *** made a false statement, material to the issue in question, being his qualifications as an arson investigator, while testifying that arson had been committed on Apr. 3, 1977, at the home of Amil T. Cornille ***."

Transcripts from Illinois Institute of Technology, Roosevelt University and Wright Junior College convincingly establish that Michaelson lied when he testified at Cornille's trial that he had an associate degree from Wright Junior College and a bachelor's degree in science with a major in chemistry from the Illinois Institute of Technology and that he had taken over 25 credit hours in post-graduate courses such as physics and optics. In fact, the transcripts show that Michaelson had a record of extremely low scholarship; that he had been suspended on several occasions for his lack of academic diligence; and that he had not received an academic degree from any of the schools.

The convincing evidence of Michaelson's false testimony makes this case unique. Often when defendants seek a new trial based on allegations that false testimony was offered at their trial the principal issue is a factual one: whether the defendant has established by clear and convincing evidence that the testimony was false. These cases often involve the recantation of a witness or other new evidence of

questionable reliability. (See, *e.g., People v. Bracey* (1972), 51 Ill. 2d 514, 519-20.) The defendant in the typical case alleges that this evidence suggests that false testimony occurred at his trial. The inherent unreliability of a person who recants his testimony often makes it difficult for a court to grant a new trial solely upon this basis. See, *e.g., People v. Marquis* (1931), 344 Ill. 261, 265 ("Those experienced in the administration of criminal law well know the untrustworthy character of recanting testimony"); see also *People v. Nash* (1966), 36 Ill. 2d 275, 285.

In this case, however, the prosecution admits, and the circuit court found, that Cornille has established beyond doubt that false testimony was given at his trial. Beyond that, the witness who allegedly gave the false testimony has been charged by information with perjury in connection with his testimony at that trial. It is antithetical to our system of justice to refuse to grant a new trial for a defendant when it is convincingly established that he was convicted on the basis of false testimony.

In this connection it is interesting to note the history of one of the other cases in which Dennis Michaelson offered crucial expert testimony for the prosecution. In *People v. Alfano* (1981), 95 Ill. App. 3d 1026, the defendant, Pietro Alfano, was convicted of aggravated arson and arson with intent to defraud his insurer. There was substantial evidence at trial that the fire in Alfano's restaurant was incendiary in origin. Mr. Alfano, however, maintained that the fire had been set by an unknown gunman who assaulted him in the restaurant before setting the fire. After relating the same false credentials that he offered at the Cornille trial, Michaelson testified that in testing samples of the clothing that the defendant wore on the evening of the fire he had discovered traces of gasoline.

After the newspaper article revealed that Michaelson had lied about his expert qualifications, Alfano filed a petition under section 72 of the Civil Practice Act (Ill. Rev.

Stat. 1979, ch. 110, par. 72) seeking a new trial. The trial court denied the petition without an evidentiary hearing. The appellate court reversed and remanded for an evidentiary hearing, holding that the presentation of false testimony by the State warranted a new trial: "Michaelson's presentation to the jury as an 'expert' witness afforded invalid and undue support to the State's theory that the defendant was the one who set the fire." (95 Ill. App. 3d 1026, 1031.) Records of the circuit court of Boone County in cause No. 79—CF—18 indicate that on May 14, 1982, the court ordered a new trial and on August 16, 1982, the case was dismissed without prejudice on the State's motion.

It would be anomalous for this court to deny Amil Cornille a new trial, especially when the evidence relating to the cause of the fire appears to be much closer in this case than in *Alfano*. The prosecution would have us justify this anomaly on the ground that Alfano sought relief under the broad remedial provisions of section 72 while Cornille sought relief under the more limited post-conviction hearing provisions of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 122—1 *et seq.*). Under those provisions, Cornille can prevail only by establishing a substantial infringement of his constitutional rights (*People v. Martin* (1970), 46 Ill. 2d 565, 568), in this case his right to due process of law.

To establish a violation of due process the defendant must demonstrate that some action of the State was inconsistent "with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions" (*Hebert v. Louisiana* (1926), 272 U.S. 312, 316, 71 L. Ed. 270, 273, 47 S. Ct. 103, 104), and which reflect "the community's sense of fair play and decency" (*Rochin v. California* (1952), 342 U.S. 165, 173, 96 L. Ed. 183, 191, 72 S. Ct. 205, 210). "Perjury is the mortal enemy of justice" (*People v. Shannon* (1975), 28 Ill. App. 3d 873,

878), and it has long been recognized that the deprivation of an individual's liberty based upon false testimony is contrary to fundamental principles of fairness in a civilized society (see, *e.g., Mooney v. Holohan* (1935), 294 U.S. 103, 112, 79 L. Ed. 791, 794, 55 S. Ct. 340, 341-42 (*per curiam*); *Napue v. Illinois* (1959), 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177). Every major civil and common law jurisdiction has provided some means of redress for persons unjustly convicted on false testimony. (See, *e.g.,* Murray, *Convictions Obtained by Perjured Testimony: A Comparative View,* 27 Ohio St. L.J. 102 (1966) (reviewing remedies provided by the United States, Great Britain, France, Germany, Spain, and Mexico).) As the Supreme Court observed in granting a new trial under its supervisory authority, "The government of a strong and free nation does not need convictions based upon such testimony." *Mesarosh v. United States* (1956), 352 U.S. 1, 14, 1 L. Ed. 2d 1, 10, 77 S. Ct. 1, 8; see also *Communist Party of the United States v. Subversive Activities Control Board* (1956), 351 U.S. 115, 100 L. Ed. 1003, 76 S. Ct. 663.

Nevertheless, the People contend, and the circuit and appellate courts in this case held, that Michaelson's false testimony does not rise to the level of constitutional defect because it did not involve sufficient State action to constitute a violation of due process. They claim that his false testimony was merely the act of a private individual for which there is no remedy under the due process clause. (See, *e.g., USA I Lehndorff Vermoegensverwaltung GmbH & Cie v. Cousins Club, Inc.* (1976), 64 Ill. 2d 11, 18-21.) In support of this argument the People observe that the lower Federal courts have almost uniformly held that it is only the knowing use of false testimony by the prosecution or other agents of the State which violates due process. See, *e.g., United States ex rel. Burnett v. Illinois* (7th Cir. 1980), 619 F.2d 668, 673-75, *cert. denied* (1980), 449 U.S. 880, 66 L. Ed. 2d 104, 101 S. Ct. 229; *Burks v. Egeler*

(6th Cir. 1975), 512 F.2d 221, 224-29, *cert. denied* (1975), 423 U.S. 937, 46 L. Ed. 2d 270, 96 S. Ct. 297.

The People also argue that *People v. Frank* (1971), 48 Ill. 2d 500, 506, supports a holding that only knowing use of false testimony violates due process. (See also *People v. Smith* (1968), 41 Ill. 2d 158, 163, *cert. denied* (1969), 396 U.S. 852, 24 L. Ed. 2d 101, 90 S. Ct. 111.) In *Frank* the defendant alleged in a petition for post-conviction relief that due process was violated when a police informer testified falsely concerning his identity and his record of prior convictions. This court affirmed the circuit court's denial of an evidentiary hearing on the petition, noting that it "neither stated nor supported in any way the present suggestion that the prosecution knowingly concealed the informer's identity prior to trial and knowingly permitted him to testify falsely." 48 Ill. 2d 500, 506.

Cornille urges that we distinguish *Frank* and hold that it is a violation of due process whenever false testimony on a material matter occurs at a criminal trial. He claims that the involvement of the State's adjudicatory processes in Michaelson's false testimony is alone sufficient State action to establish a violation of due process. *Cf. Shelley v. Kraemer* (1948), 334 U.S. 1, 92 L. Ed. 1161, 68 S. Ct. 836 (use of State's judicial process by private persons to enforce racially restrictive covenants is State action violating due process).

In *People v. Shannon* (1975), 28 Ill. App. 3d 873, the appellate court adopted a position similar to that advanced by Cornille:

"[T]he use of the State's judicial process to enforce a right of the People, the violation of which is based upon the perjured testimony of a private individual, constitutes State action whether or not the State knew that the testimony was perjured. Known to the State or not, the use of its judicial process to convict and imprison on perjured testimony is a miscarriage of justice which is abhorrent to fundamental fairness and as such is intolerable." (28

Ill. App. 3d 873, 878.)

Accord, *People v. Hilliard* (1978), 65 Ill. App. 3d 642, 647; *People v. Sims* (1972), 4 Ill. App. 3d 878, 880; *Riley v. State* (1977), 93 Nev. 461, 462, 567 P.2d 475, 476 ("the truth seeking function of the trial is corrupted by *** perjury whether encouraged by the prosecutor or occurring without his knowledge"); *People v. Yamin* (1965), 45 Misc. 2d 407, 416-17, 257 N.Y.S.2d 11, 22-23; see also *Jones v. Kentucky* (6th Cir. 1938), 97 F.2d 335, 338; *cf. People v. Alfano* (1981), 95 Ill. App. 3d 1026, 1031 (relies on *Shannon* in granting new trial under section 72).

In *Shannon* the appellate court reasoned that *Frank* did not require an allegation of "knowing use" to state a violation of due process. (*People v. Shannon* (1975), 28 Ill. App. 3d 873, 877-78.) Frank's petition charged "knowing use," but it lacked specific allegations supporting that charge and thus failed to comply with the pleading requirements of the post-conviction-hearing provisions (Ill. Rev. Stat. 1975, ch. 38, par. 122—2). According to the appellate court in *Shannon,* it was for that reason that this court in *Frank* affirmed the trial court's denial of an evidentiary hearing on the defendant's petition.

In this case, however, we need not adopt the approach of the appellate court in *Shannon.* The unique situation of an expert witness lying about his qualifications as an expert creates additional indicia of State action which, when linked to the involvement of the State's adjudicatory processes, makes his conduct a violation of due process, even under the more restrictive approach of the Federal courts.

In several cases courts have held that false testimony by a witness at a criminal trial violates due process even though the State's involvement in the testimony in those cases did not rise to the level of knowing use. In each of these cases there was some lack of diligence on the part of the State which satisfied the State action requirement.

For example, in *Giglio v. United States* (1972), 405

U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763, a crucial government witness falsely asserted that he had received no promise of leniency in exchange for his testimony. The assistant United States Attorney who was prosecuting the case had no knowledge of the offer of leniency because another assistant had made the promise. The Supreme Court held that the government had a duty to disclose the offer of leniency and to correct the false testimony of the witness. Its failure to do so violated due process "whether the nondisclosure was a result of negligence or design." 405 U.S. 150, 154, 31 L. Ed. 2d 104, 109, 92 S. Ct. 763, 766; see also *People v. McKinney* (1964), 31 Ill. 2d 246, 250-51.

A key government witness falsely testified in *Imbler v. Craven* (C.D. Cal. 1969), 298 F. Supp. 795, *aff'd per curiam* (9th cir. 1970), 424 F.2d 631, *cert. denied* (1970), 400 U.S. 865, 27 L. Ed. 2d 104, 91 S. Ct. 100, that he had earned college degrees in both industrial relations and engineering. The witness had a history of felony convictions and State mental hospital commitments and had testified that he had earned the second college degree only one year after his release from prison. The court held that this "reckless use of highly suspicious false testimony" (298 F. Supp. 795, 807) violates due process:

> "Due process of law does not tolerate a prosecutor's selective inattention to such significant facts. It requires that he exercise good faith in prosecuting that case. *** The duty of good faith is not merely a negative one, to omit from one's case outright lies. It imposes as well an affirmative duty to avoid even unintentional deception and misrepresentation, and in fulfilling that duty the prosecutor must undertake careful study of his case and exercise diligence in its preparation, particularly where he is confronted with facts tending to cast doubt upon his witness' testimony. The prosecutor's objective is justice; his role is not that of a mere advocate. The goal of justice is hardly satisfied by less." (298 F.Supp. 795, 808-09.)

Other courts have applied negligence or recklessness standards in deciding whether to hold the prosecution responsi-

ble for the false testimony of a government witness. See, e.g., *Sawyer v. Barczak* (7th Cir. 1956), 229 F.2d 805, 810, *cert. denied* (1956), 351 U.S. 966, 100 L. Ed. 1486, 76 S. Ct. 1025; *Wild v. Oklahoma* (10th Cir. 1951), 187 F.2d 409, 410; *Runnels v. State* (Okla. Crim. 1977), 562 P.2d 932, 936, *cert. denied* (1977), 434 U.S. 893, 54 L. Ed. 2d 179, 98 S. Ct. 270.

These cases teach us that under certain circumstances the prosecutor should not be permitted to avoid responsibility for the false testimony of a government witness by failing to examine readily available information that would establish that the witness is lying. It would have been a simple procedure in this case for the State to have verified Michaelson's qualifications before he testified at Cornille's trial. As a direct result of its failure to do so, false testimony occurred at the trial, and a fraud was perpetrated on the court and on the defendant. Under the circumstances of this case, it is our view that the State's lack of diligence creates enough involvement by it in the false testimony to establish a violation of due process.

The prosecution concedes that Michaelson testified on behalf of the People in at least two other criminal trials, and considering that he allegedly investigated over 1,300 fires in his 14-year career as a "fire investigator," he may have testified in many more. The frequency of his testimony for the State highlights the fact that Michaelson was not merely an occurrence witness whose presence at the trial was determined by his relationship to the facts of the case. The State selected him to offer the jury his expert opinion on the causes of the fire and relied upon the credibility imparted by his expertise to win an otherwise closely balanced case. As the prosecution made the mistake of producing an expert witness who was an imposter, it is only fair to charge it with responsibility for the imposter's false testimony. *Cf. Trapp v. American Trading & Production Corp.* (1979), 66 A.D.2d 515, 519, 414 N.Y.S.2d 11, 13

(new trial required in civil case where it was shown that an expert witness had lied about his qualifications as an expert).

Moreover, it is obvious that every party, including the State, has an obligation to verify the credentials of its expert witnesses. It is only on the basis of these credentials that experts are permitted to offer their professional opinions concerning the factual issues disputed in the criminal proceeding. This type of purportedly objective opinion testimony may have considerable influence on the jury, and the rules for qualifying expert witnesses are designed to ensure that only genuine experts will offer it. Pitting the defendant's protestations of innocence "against the objective test results of an expert is an acceptable contest in an adversary proceeding, but only when all the players are on the official roster, and not when one is a ringer." (*People v. Alfano* (1981), 95 Ill. App. 3d 1026, 1031.) We hold that under the circumstances of this case there was sufficient involvement by the State in the false testimony offered by Michaelson to satisfy the State-action requirement of the due process clauses of the State and Federal constitutions.

Once the defendant establishes the condemned use of false testimony, he is entitled to a new trial unless the State can establish beyond a reasonable doubt that the false testimony was immaterial in that it did not contribute to the conviction. (*People v. Bracey* (1972), 51 Ill. 2d 514, 520; see also *People v. Martin* (1974), 56 Ill. 2d 322, 325.) We believe that there is a reasonable likelihood that Michaelson's false testimony concerning his qualifications as an expert might have affected the jury's decision. Even though the false testimony went only to the issue of his credibility it may constitute reversible error. *People v. Galloway* (1974), 59 Ill. 2d 158, 164; *People v. Coddington* (1964), 31 Ill. 2d 468, 471.

The evidence concerning the cause of the fire was closely balanced, as pointed out above, and Michaelson of-

fered the crucial testimony which explained why he knew that accelerants were present at the scene of the fire. His claim of having vastly improved equipment for use in his gas chromatography analysis greatly diminished the persuasiveness of the State forensic scientist who, in using the same diagnostic technique, found no traces of gasoline in other samples of debris.

The prosecutor recognized the importance of this testimony. In cross-examining each of the defendant's expert witnesses the prosecutor made repeated references to Michaelson's testimony. Again, in his closing argument the prosecutor highlighted that testimony and emphasized Michaelson's formidable, but falsified, qualifications as an expert. Under these circumstances we conclude that these false academic credentials reasonably may have had an effect on the jury's decision.

For all these reasons we hold that Mr. Michaelson's false testimony about his qualifications as an expert witness violates due process of law guaranteed under both the State and the Federal constitutions, and that the defendant is entitled to a new trial. The judgment against Amil T. Cornille is reversed and the cause is remanded to the circuit court for a new trial.

*Reversed and remanded.*