THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES BALLARD, Defendant-Appellant.

Fourth District    No. 4—02—0742

Argued December 10, 2003.—Opinion filed February 23, 2004.

Daniel D. Yuhas and Robert N. Markfield (argued), both of State Appellate Defender's Office, of Springfield, for appellant.

Scott Rueter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, and Denise M. Ambrose (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

After a March 2002 jury trial in the Macon County circuit court, defendant, James Ballard, was convicted of unlawful possession of a controlled substance (cocaine) with intent to deliver with a prior unlawful-possession-of-a-controlled-substance-with-intent-to-deliver conviction. 720 ILCS 570/401 (West 2000); 730 ILCS 5/5—5—3(c)(2)(D) (West 2000). In April 2002, the trial court sentenced him to 15 years' imprisonment. Defendant appeals, contending (1) he was denied a fair trial because the State's expert witness testified falsely regarding his own testimony in a prior drug case; (2) the State failed to prove he had the intent to deliver beyond a reasonable doubt; and (3) the trial court erred in not ruling on his motion *in limine*, prior to his testimony, as to whether his prior conviction for the same offense could be used to impeach him. We affirm.

## I. BACKGROUND

On the evening of July 13, 2001, Decatur police officers executed a search warrant on defendant's apartment. Upon kicking down the door to the apartment, Sergeant Brian Bell entered the apartment and pursued defendant as he ran down the hallway to the bathroom. Once there, Sergeant Bell retrieved a large plastic bag defendant was attempting to flush down the toilet. Inside the plastic bag were 41 plastic Baggie corners containing a chunky, yellowish rock substance.

Prior to trial, defendant unsuccessfully challenged the execution of the search warrant. He also filed a motion *in limine* asking that the

State be precluded from introducing his 1994 conviction for possession with intent to deliver cocaine, citing prejudicial impact. Defendant renewed his motion during trial, arguing the outcome of the motion would impact his decision on whether to testify. The trial court refused to rule on the motion in advance of defendant testifying, stating the motion was premature.

Trial in this matter began on March 7, 2002. Decatur police officer Chad Ramey testified he conducted surveillance on defendant and his apartment prior to execution of the search warrant. Shortly before execution of the search warrant, defendant left his apartment, went to another apartment, and returned. Officer Ramey also participated in searching defendant's apartment in execution of the warrant. Defendant told him he lived in the apartment, although Officer Ramey found the usual indicators of occupancy were missing. There was Kool-Aid in the refrigerator but no food. There was no bread or other food items found in the apartment. Two boxes of plastic sandwich bags were found on the kitchen table. One box was empty, and the other was about three-quarters full. There were few plates and cups in the kitchen. The living room had two couches, a large screen television, multiple DVD (digital video disc) players, and a large stereo system and speakers. Next to one of the couches was a police scanner. Defendant was unemployed but recently purchased an automobile. Officer Ramey found no devices that could be used to smoke crack cocaine.

Mike Cravens, an analyst for the Illinois State Police crime lab, testified he tested the contents of 18 of the 41 Baggies and found them to contain cocaine. The aggregate weight of the 18 rocks of cocaine was 5.1 grams. Individually, they ranged in size from 0.194 grams to 0.359 grams. Cravens visually inspected the contents of the remaining 23 Baggies and found them to be similar in size and appearance to the 18 rocks of cocaine. The gross weight of the 23 remaining Baggies and their contents was 8.6 grams. Cravens did not test the contents of the remaining 23 Baggies because the penalty classifications were the same whether defendant possessed 5 grams or 13 grams of cocaine.

Edward Root, a Decatur police officer with 13 years of service as an agent with the Illinois State Police Task Force X, a drug enforcement unit, testified as an expert on illegal drug use and distribution. Root testified to many hours of training and many years of experience, including testifying as an expert in more than 50 cases in Macon County and more than 10 cases in federal court.

Officer Root testified a typical dosage unit of crack cocaine was 0.2 grams and cost approximately $20 on the street. Therefore, the street value of the 18 packets of crack cocaine would be approximately $360.

Without objection, Root stated all 41 packets had the color, texture, and method of packaging consistent with crack cocaine. While Root testified a crack addict could go through multiple dosage units in a short time, he was not sure an addict could consume that much crack cocaine in two days. The physical effects of crack cocaine last from 20 to 60 minutes. A heavy user of crack cocaine would purchase the drug in bulk packaging and not in multiple small packages to obtain a price break. Root had never encountered an individual who purchased 18 individually packaged units solely for personal use.

Root stated the absence of smoking paraphernalia was an indicia of intent to deliver, although he acknowledged crack cocaine can be smoked through a variety of small household items. He stated in many instances drug dealers do not keep records, scales, cash, cellular phones, pagers, or cutting agents, although these can all be indicia of intent to deliver. In addition, many times crack cocaine is packaged at one location and sold at another. When dealers have recently obtained a new supply of drugs to sell, they will have little to no cash.

Root gave his opinion that the amount and manner of packaging of the crack cocaine in defendant's possession as well as the absence of smoking paraphernalia were consistent with intent to deliver rather than personal use.

Defense witnesses were Clarence Ballard, defendant's brother, and Theresa Hardy, defendant's sister. Both testified to defendant's addiction to crack cocaine and, especially, defendant's capacity and inclination for prodigious personal consumption of crack cocaine.

Clarence testified, before he changed his life, he and defendant would smoke "anything we could get our hands on." Clarence stated a crack cocaine addict was never sated. An addict always wants more. He stated defendant would consume 18 dosage units in half an hour. He also stated he and defendant would sometimes obtain crack cocaine in individually wrapped packages if that was all they could find but agreed with Root it was cheaper, and therefore more preferable, to obtain crack cocaine in bulk.

Hardy, although not a user herself, testified she had seen defendant smoke crack cocaine on numerous occasions, up to $3^1/2$ hours straight. He would use a small metal car antenna as a pipe.

After defendant's motion *in limine* was denied, he declined to testify, citing the trial court's decision to defer ruling on the motion until after his testimony as the deciding factor.

Defendant was convicted of possession of a controlled substance with intent to deliver (between 5 and 15 grams) with a prior conviction for unlawful possession of a controlled substance with intent to deliver, a Class 1 felony. He filed a posttrial motion, which the trial

court denied, and the court sentenced him to 15 years' imprisonment. His motion to reduce sentence was also denied, and this appeal followed.

## II. ALLEGED FALSE TESTIMONY BY STATE'S EXPERT WITNESS

Defendant contends Root testified falsely when he stated he had testified in a prior case the evidence in that case *was* consistent with personal use and not intent to deliver. After Root gave his opinion that the amount and manner of packaging crack cocaine in this case were consistent with intent to deliver rather than personal use, defense counsel asked Root if he had ever testified as an expert on drug distribution and found the circumstances were consistent with mere personal use as opposed to intent to distribute. Root cited his testimony in one prior case:

"Q. Isn't it true in [*sic*] each and every time that you testified as an expert witness, your opinion has always been the same, and you have testified under oath every time that the amount of drugs that you are presented with in the case is consistent with distribution as opposed to personal use?

A. That would be incorrect.

Q. Can you cite the case?

A. Rafael Kennedy. Possession of heroin. I testified that the amount he possessed was consistent with personal use.

\* \* \*

Q. And the charge in that case was possession with intent to deliver?

A. Yes. He had—[w]as—[h]e was charged with possession of heroin; also, possession of, I believe, methadone.

Q. What about the methadone? Did you express a contrary opinion with respect to the methadone?

A. I want to say that that wasn't allowed in the testimony. I believe there was an objection to that. I don't think I was able to testify to that.

Q. So there was one case out of however many you said wherein the only opinion you expressed was that the amount of heroin that that particular individual possessed or allegedly possessed was consistent or more consistent with personal use as opposed to distribution?

A. That's the one that I can recall."

This issue was not raised in the trial court but raised for the first time on appeal. Appellate counsel in the present case was also the appellate counsel in the case cited by Root. The record has been supplemented with the transcript of Root's testimony in People v.

Rafael Kennedy, Macon County case No. 98—CF—1743. Root testified in that case on May 24, 2000. He was asked to give his opinion as to whether the heroin was for personal consumption or for distribution:

"Q. Based upon your training and your experience[,] People's [e]xhibit [No.] 1 in and of itself, do you have an opinion just from that exhibit whether that is consist [sic] at any time with possession for personal use or possession with intent to deliver?

\* \* \*

A. With regards to [e]xhibit [n]umber 1, the presence of [10] individually packaged units would lead me [\*\*\*] it is an amount to distribute.

Q. What factors do you base that opinion?

A. The fact that they are individually packaged rather than one package, plus the presence of packaging materials, which were found in the residence."

As for his testimony regarding methadone, Root stated:

"A. I haven't had a lot [sic] experience in it. I know that there is somewhat of an [underground] network through interviewing several people who have used heroin who have been going through [m]ethadone treatment. It is common for them to sometimes get rid of their [m]ethadone in exchange of [sic] other drugs.

Q. But you don't sell [m]ethadone?

A. I have never encountered anybody who actually sold [m]ethadone, no.

\* \* \*

Q. You indicated that you don't know of people who sell [m]ethadone for cash, but you know people who trade [m]ethadone for what, heroin?

A. Yes, well[,] and some do it for crack.

Q. So those people deliver that [m]ethadone to the people, they obtain the controlled the other controlled substance from?

A. Yes.

Q. And before they deliver it, they would possess it with intent to deliver wouldn't they? The [m]ethadone?

A. Yes.

\* \* \*

Q. Who would possess with intent to deliver? The people that are selling it or trading it with the dealer?

A. The person who is going to the [m]ethadone treatment receives the [m]ethadone from the clinic. They, people involved in this, will take it to the person who they are trading it for drugs with.

Q. But not the dealer. The dealer would just be buying it for himself. Is that correct?

A. I have never interviewed anybody that has [had] it for resale."

Based on this testimony, defendant asserts Root testified falsely concerning whether he had ever testified an amount of drugs was consistent with personal use. He claims the effect of this testimony was to establish his record as an objective and balanced authority, and defendant equates this testimony with the falsifying of credentials by expert witnesses in other cases.

■ In *People v. Cornille*, 95 Ill. 2d 497, 514, 448 N.E.2d 857, 866 (1983), our supreme court concluded once a defendant establishes the condemned use of false testimony, he is entitled to a new trial unless the State can establish beyond a reasonable doubt the false testimony was immaterial in that it did not contribute to the defendant's conviction. Defendant contends the State cannot establish beyond a reasonable doubt its use of false testimony was immaterial in that it did not contribute to his conviction because even though the false testimony went only to the issue of credibility, it may constitute reversible error. See *Cornille*, 95 Ill. 2d at 514, 448 N.E.2d at 866.

In *Cornille*, 95 Ill. 2d at 506, 448 N.E.2d at 859, an expert witness clearly and knowingly lied about his qualifications and academic credentials. The case turned on the sharply divergent testimony of expert witnesses. The State repeatedly emphasized the credentials, experience, and professional reputation of its expert. The supreme court not only concluded the expert's false testimony was crucial, but also faulted the State for failing to take the simple step to verify the expert's qualifications. *Cornille*, 95 Ill. 2d at 514, 448 N.E.2d at 865-66. The State here vouched for Root's credentials, but it was not in a position to guarantee he would remember with accuracy all his previous service as an expert.

■ Root may have mistakenly recalled his testimony from a trial held almost two years earlier. This inaccurate testimony was in response to cross-examination. It was not offered or anticipated by the State. Root may have been surprised to be asked if he had ever testified as an expert and found the circumstances of drug possession were consistent with mere personal use as opposed to intent to distribute. As a police officer and expert tendered by the State, it is expected he would only testify to an opinion supporting the State's theory of the case or the State would not call him as a witness.

Root's mistake did not constitute the kind of condemned perjured testimony as given by the expert in *Cornille*. Nothing here shows Root knew his testimony to be untrue or intended to mislead the jury. The jury was not given a false impression. Defense counsel was able to use the same strategy to attack Root. Defense counsel argued there was only *one* case in all the times Root had testified where his opinion was

that the accused's possession was *not* for distribution; thus, he argued Root lacked objectivity. Counsel then argued the opinion offered by Clarence Ballard, who admitted using crack with defendant in the past, was more credible.

We agree Root's testimony on that single point was not accurate, but Clarence confirmed most of what Root told the jury. Clarence stated he and defendant would attempt to buy crack in a "big chunk" because it was cheaper and dealers mostly sold individually packaged rocks. Further, Theresa Hardy, defendant's sister, testified defendant would smoke crack in a two-inch pipe constructed from a metal car antenna, but officers found no such device in the apartment. This testimony, combined with the amount of crack, the presence of a police scanner and high-priced electronic equipment when defendant was unemployed (equipment he might sell to buy more crack if he were just an addict), and the absence of typical signs of residency in the apartment permit the strong inference defendant possessed crack cocaine with intent to deliver.

It was unwise for Officer Root to attempt to counter cross-examination by offering up a specific case and a specific defendant to show he had *once* testified drug possession under certain circumstances was consistent with personal use as opposed to intent to distribute. His faulty or inaccurate memory—perhaps associated with testimony regarding methadone in that remembered case—injected an issue for defendant to use on appeal. However, on this record, we conclude the inaccurate recollection did not contribute to the jury's decision.

### III. PROOF OF INTENT TO DELIVER BEYOND A REASONABLE DOUBT

■ Defendant contends the State failed to prove his intent to deliver beyond a reasonable doubt. The standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Schott*, 145 Ill. 2d 188, 203, 582 N.E.2d 690, 697 (1991). Direct evidence of intent to deliver controlled substances is rare, and the intent must usually be proven by circumstantial evidence. *People v. Robinson*, 167 Ill. 2d 397, 408, 657 N.E.2d 1020, 1026 (1995). The issue to be resolved in this case is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt defendant intended to deliver the cocaine that was in his possession. See *Robinson*, 167 Ill. 2d at 407, 657 N.E.2d at 1026.

■ The three elements of intent to deliver are (1) the defendant

had knowledge of the presence of the controlled substance, (2) the controlled substance was in the immediate possession or control of the defendant, and (3) the defendant intended to deliver the controlled substance. 720 ILCS 570/401 (West 2000); *Robinson*, 167 Ill. 2d at 407, 657 N.E.2d at 1026; *People v. Johnson*, 334 Ill. App. 3d 666, 677, 778 N.E.2d 772, 781-82 (2002).

■ The following factors have been considered by courts as probative of intent to deliver: (1) whether the quantity of controlled substance is too large to be viewed as being for personal consumption; (2) high purity of drug confiscated; (3) possession of weapons; (4) possession of large amounts of cash; (5) possession of police scanners, beepers, or cellular phones; (6) possession of drug paraphernalia; and (7) the manner in which substance is packaged. *Robinson*, 167 Ill. 2d at 408, 657 N.E.2d at 1026-27. Whether the inference of intent is sufficiently raised is determined on a case-by-case basis (*Robinson*, 167 Ill. 2d at 412-13, 657 N.E.2d at 1029); thus, the enumerated factors are not exclusive.

The quantity of a controlled substance alone can be sufficient evidence to prove intent to deliver beyond a reasonable doubt where the amount of the controlled substance could not reasonably be viewed as designed for personal consumption. *Robinson*, 167 Ill. 2d at 410-11, 657 N.E.2d at 1028. Further, under the appropriate circumstances, the packaging of a controlled substance, alone, may be sufficient evidence of intent to deliver. *Robinson*, 167 Ill. 2d at 414, 657 N.E.2d at 1029. The standard often cited to meet "the minimum floor of evidence" necessary to establish an intent to deliver is "drugs packaged for sale and any *one* additional factor tending to show intent to deliver." (Emphasis in original.) *People v. Beverly*, 278 Ill. App. 3d 794, 802, 663 N.E.2d 1061, 1067 (1996).

Defendant contends in this case he possessed only 18 rocks of cocaine weighing 5.1 grams. He notes the absence of other indicia of intent to deliver: currency, weapons, discarded Baggie corners, drug paraphernalia, pagers, beepers, cellular phones, or scales. He points to the testimony of his brother Clarence that he was a heavy user of crack cocaine and could have consumed such an amount personally in a short period of time. However, Clarence also testified that because he and defendant were heavy users, they usually purchased cocaine in large bulk rather than individually packaged doses to obtain favorable pricing.

■ However, only one factor indicating intent to deliver is needed in addition to the drugs packaged for delivery. This case involved more than 18 individually packaged units. Although only 18 were tested, the remaining 23 looked exactly like the 18 which were proved to contain

crack cocaine. Where additional untested packets, similar in size and appearance to packets that tested positive for cocaine, are found in the same bag, they can be viewed as probative of intent to deliver. See *Robinson*, 167 Ill. 2d at 410, 657 N.E.2d at 1027. Thus, the quantity of the individually packaged units in this case indicated an intent to deliver.

Other evidence included the absence of the normal accoutrements of residency in an apartment; no food but two boxes of plastic sandwich bags, the corners of which are commonly used to package rocks of crack cocaine; and a police scanner. One box of the sandwich bags was empty, and the other about three-quarters full. Officer Ramey testified he found a police scanner, although he did not take it into evidence, and he knew the difference between a police scanner and a citizens band (CB) radio. Clarence, an admitted cocaine addict, testified defendant had only a CB radio. The jury was entitled to believe Officer Ramey over Clarence.

No cash was found on defendant, but Officer Ramey testified defendant left the apartment, drove to another apartment, and returned 10 minutes before the search warrant was executed. Officer Root testified dealers would not have cash on hand if they had just purchased a supply of drugs to sell and cocaine is sometimes packaged and sold at separate locations.

Although unemployed, defendant had recently purchased an automobile and was in possession of a 60-inch color TV, several DVD players, and a large stereo system. Although Clarence and Theresa testified defendant was a crack user, without another source of income, defendant might well have to sell cocaine to buy for his own use or sell his possessions such as the car, TV, DVD players, and stereo.

Taken in the light most favorable to the State, intent to deliver cocaine was proved beyond a reasonable doubt.

### IV. MOTION *IN LIMINE*

■ Defendant filed a motion *in limine* prior to trial. He contends the trial court erred in declining his request for a ruling, prior to his testimony, as to whether his 1994 conviction for possession with intent to deliver could be used to impeach him in this trial for the same offense. Prior felony convictions within 10 years of the current offense are available to impeach a defendant's credibility only where the trial court conducts a balancing test and determines the probative value outweighs the prejudicial effect. *People v. Montgomery*, 47 Ill. 2d 510, 516-19, 268 N.E.2d 695, 698-700 (1971). Because the trial court refused to engage in the *Montgomery* balancing test until he had testified and the State offered certified copies of his prior conviction for impeach-

ment purposes, defendant contends he opted not to testify and now contends the refusal of the trial court acted as an unfair deterrent on his right to testify.

The United States Supreme Court has held a defendant who does not testify at trial is not entitled to appellate review of a trial court's ruling denying a motion *in limine* seeking to forbid the use of prior convictions for impeachment purposes because the argument of possible harm from the ruling on the motion is wholly speculative. *Luce v. United States*, 469 U.S. 38, 41, 83 L. Ed. 2d 443, 447, 105 S. Ct. 460, 463 (1984). A reviewing court cannot assume an adverse ruling on the motion motivated the defendant to refrain from testifying. *Luce*, 469 U.S. at 41-42, 83 L. Ed. 2d at 448, 105 S. Ct. at 463-64. The reasoning of *Luce* has been adopted by many other courts, including those in *People v. Thompkins*, 161 Ill. 2d 148, 193, 641 N.E.2d 371, 392 (1994), and *People v. Helton*, 195 Ill. App. 3d 410, 419, 552 N.E.2d 398, 404-05 (1990).

The same reasoning could apply where a trial court has not made a ruling on the motion *in limine*. While defendant contends the trial court's refusal to rule on the motion was the motivating factor behind his reason for not testifying, the harm caused by the refusal to rule is speculative as a defendant's decision not to testify is seldom based on only one factor. It is impossible for a reviewing court to determine if the error was harmless without benefit of a defendant's testimony. *Luce*, 469 U.S. at 42, 83 L. Ed. 2d at 448, 105 S. Ct. at 463-64.

The trial court in this case specifically observed it had no way of knowing what the substance of defendant's testimony would have been, and therefore, it could not apply the balancing test required under *Montgomery*. Likewise, we also refuse to guess at what defendant's testimony might have been, and therefore, we find the court's refusal to rule on the motion was not error.

Further, we note our prior decision in *People v. Owen*, 299 Ill. App. 3d 818, 701 N.E.2d 1174 (1998), where we held a trial court is not obligated to consider a motion *in limine* on the merits at all. *Owen*, 299 Ill. App. 3d at 822, 701 N.E.2d at 1177. A trial court need not make a preliminary ruling on the admissibility of a defendant's prior convictions to impeach him before they become at issue, and they become at issue only after (1) a defendant has testified, and (2) the State seeks to introduce his prior convictions for impeachment purposes in its rebuttal case. *Owen*, 299 Ill. App. 3d at 824-25, 701 N.E.2d at 1179.

■ Defendant asks us to reconsider our decision in *Owen* due to the chilling effect that withholding the *Montgomery* balancing test until after a defendant has testified has on a defendant's right to

testify in his own defense. Failing that, he attempts to distinguish *Owen* by noting in that case, the trial court refused to rule on the defendant's motion because it was untimely as it was filed after the last date for filing of pretrial motions. *Owen*, 299 Ill. App. 3d at 820-21, 701 N.E.2d at 1176. In this case, the motion was timely filed on November 27, 2001, and called for hearing on March 7, 2002, immediately prior to opening statements in the trial. In addition, he renewed his motion after both of his defense witnesses had testified, and it was clear his strategy was to essentially admit to possession of cocaine but deny any intent to deliver. As the State notes, however, defendant entered a not guilty plea to *all* charges against him, including those solely for possession, and it is impossible to be certain how defendant would have testified.

As we noted in *Owen*, our decision was not based on the fact that the trial court refused to rule on defendant's motion as not timely filed.

> "[A] court is fully justified to exercise its discretion by telling the moving party that—*for whatever reason*—the court chooses not to entertain the party's motion *in limine* and instead will require the evidence in question, if it is to be offered at all, to be presented in the normal course of things during trial. The court will then make its ruling upon the evidentiary question at issue when the matter has become ripe, assuming it ever does.
>
> We so hold because, if the court must 'balance the prejudice that might be avoided if it grants the motion against the complication or inconvenience that would result if the motion is denied' (*Rush [v. Hamdy]*, 255 Ill. App. 3d [352], 365, 627 N.E.2d [1119], 1127 [(1993)]), a court might easily conclude that the best way to ensure a correct ruling on a complicated evidentiary issue is to wait for that issue to become ripe at trial. Then the court would no longer need speculate about what the trial evidence *might be*; instead, the court has already heard that evidence, and the context in which to decide the evidentiary issue has become clear." (Emphases in original.) *Owen*, 299 Ill. App. 3d at 823-24, 701 N.E.2d at 1178.

While we decline to overrule our decision in *Owen*, we question the trial court's refusal in this case to rule on defendant's motion *in limine*. Defendant's motion was addressed to an eight-year-old conviction for possession with intent to deliver. The prejudicial effect of the use of that conviction for impeachment is obvious. As we noted, it was also defendant's strategy to admit possession but deny any intent to deliver. What more did the trial court need to know, particularly after defense witnesses testified? Our language in *Owen* regarding a complicated evidentiary issue and waiting for the issue to become ripe hardly seems applicable in this case. We conclude the court should

have ruled and then defendant could meaningfully consider whether to exercise his right to testify. Nonetheless, we conclude it was not error for the trial court to refuse to rule on defendant's motion prior to his testifying.

## V. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

COOK and MYERSCOUGH, JJ., concur.