**UNITED STATES of America,**

v.

**Martha STEWART and Peter Bacanovic, Defendants.**

**No. 03 CR.717(MGC).**

United States District Court,
S.D. New York.

July 8, 2004.

Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York, NY, By: Robert G. Morvillo, John J. Tigue, Jr., Barry A. Bohrer, Rebecca A. Monck, Gregory Morvillo, for Defendant Martha Stewart.

O'Melveny & Myers LLP, Washington, DC, By: Walter Dellinger, Jeremy Maltby, Matthew Shors, for Defendant Martha Stewart.

Goodwin Procter LLP, New York, NY, By: Richard M. Strassberg, David J. Apfel, Cheryl R. Brunetti, Shannon J. Siragusa, Erin N. Jackson, for Defendant Peter Bacanovic.

David N. Kelley, United States Attorney, Southern District of New York, New York, NY, By: Karen Patton Seymour, Michael S. Schachter, William A. Burck, Assistant United States Attorneys, for the Government.

## OPINION

CEDARBAUM, District Judge.

Defendants Martha Stewart and Peter Bacanovic have moved for a new trial pursuant to Fed.R.Cr.P. 33 on the ground that an expert witness for the Government has been charged with committing perjury in his testimony. Because there is no reasonable likelihood that this perjury could have affected the jury's verdict, and because overwhelming independent evidence supports the verdict, the motions are denied.

## BACKGROUND

Stewart and Bacanovic were indicted on criminal charges arising from Martha Stewart's December 27, 2001 sale of 3,928 shares of stock in ImClone Systems, Inc. ("ImClone"). ImClone is a biotechnology company whose then-chief executive officer, Samuel Waksal, was a friend of Stewart's and a client of Stewart's stockbroker at Merrill Lynch, defendant Bacanovic.

On December 25, 2001, ImClone learned that the Food and Drug Administration had rejected the company's application for approval of Erbitux, a cancer-fighting drug. On December 28, the day after Stewart sold her shares, ImClone publicly announced that the Erbitux application had been rejected. Shortly after ImClone's announcement, the Securities and Exchange Commission ("SEC") and the United States Attorney's Office for the Southern District of New York launched investigations into trading in ImClone stock in advance of the announcement to the public of the news about Erbitux.

Each defendant was questioned twice in the course of these investigations. Stewart was interviewed at the office of the United States Attorney on February 4, 2002 and by telephone on April 10, 2002. Among those present during Stewart's interviews were Special Agent Catherine Farmer of the FBI and Helene Glotzer, a lawyer with the SEC's Enforcement Division. Bacanovic was interviewed by telephone on January 7, 2002. Present at that interview were Glotzer and another SEC attorney, Jill Slansky, as well as David Marcus, a Merrill Lynch attorney. On February 13, 2002, Bacanovic testified under oath before the SEC. He was questioned by three SEC attorneys: Glotzer, Slansky, and Laurent Sacharoff. His testimony was tape recorded.

The jury convicted Stewart of making false statements to investigators during her February 4 interview, in violation of 18 U.S.C. § 1001. The jury found Stewart guilty of making the following false statements, each of which was a specification in Count Three of the Indictment.[1] Stewart told the Government investigators that she

spoke to Bacanovic on December 27 and instructed him to sell her ImClone shares after he informed her that ImClone was trading below $60 per share. Stewart also stated that during the same telephone call, she and Bacanovic discussed the performance of the stock of her own company, Martha Stewart Living Omnimedia ("MSLO"), and discussed K–Mart. She told investigators that she had decided to sell her ImClone shares at that time because she did not want to be bothered during her vacation. Stewart stated that she did not know if there was any record of a telephone message left by Bacanovic on December 27 in her assistant's message log. She also said that since December 28, she had only spoken with Bacanovic once regarding ImClone, and they had only discussed matters in the public arena. Finally, Stewart told investigators that since December 28, Bacanovic had told her that Merrill Lynch had been questioned by the SEC regarding ImClone, but that he did not tell her that he had been questioned by the SEC or that he had been questioned about her account.

The jury acquitted Stewart of one specification charged in Count Three: her statement that she and Bacanovic had agreed, at a time when ImClone was trading at $74 per share, that she would sell her shares when ImClone started trading at $60 per share.

The jury found Stewart guilty of making the following false statements to investigators during her April 10 interview. Each of these statements was a specification in Count Four of the Indictment. Stewart said that she did not recall if she and Bacanovic had spoken about Waksal on

---

1. The Redacted Superseding Indictment is annexed as Appendix A to this Opinion. The verdict form given to the jury listed each specification under the false statement and perjury counts in the Indictment and instructed the jury to check the specifications which it found for each count of which it found defendants guilty. The jury verdict form is annexed to this Opinion as Appendix B.

December 27 and that she did not recall being informed that any of the Waksals were selling their ImClone stock. Stewart also reiterated that she spoke to Bacanovic on December 27, that he told her the price of ImClone shares, and that he suggested that she sell her holdings.

The jury did not find Stewart guilty of one false statement specification charged in Count Four: her statement that sometime in November or December of 2001, after she sold ImClone shares held in the Martha Stewart Defined Pension Trust, she and Bacanovic decided she would sell her remaining ImClone shares when they started trading at $60 per share.

The jury found Bacanovic guilty of making one false statement during his January 7 interview with the SEC, in violation of 18 U.S.C. § 1001. This was a specification in Count Two of the Indictment, which charged Bacanovic with falsely stating that he had spoken to Stewart on December 27, that he told Stewart during that conversation that ImClone's share price had dropped, and that Stewart had instructed him to sell her shares.

The jury found Bacanovic not guilty of the other false statement charged in Count Two: his statement that on December 20, 2001, he had a conversation with Stewart in which she decided to sell her ImClone stock at $60 per share.

The jury also convicted Bacanovic of perjury in violation of 18 U.S.C. § 1621, for one statement he made during his February 13 testimony before the SEC. Perjury was the charge in Count Six of the Indictment. Bacanovic stated that on the morning of December 27, he had left a message for Stewart with her assistant, Ann Armstrong. He said that the message requested that Stewart return his call, and advised her of the price at which ImClone was then trading.

The jury acquitted Bacanovic of five other perjury specifications charged in Count Six. These specifications related to conversations Bacanovic had had with Stewart subsequent to her December 27 trade, the circumstances of her decision on December 20 to sell ImClone at $60 per share, and a worksheet he had used during their December 20 conversation.

The jury acquitted Bacanovic of a charge of making and using a false document, which was charged as a violation of 18 U.S.C. § 1001 in Count Five of the Indictment. This count was based on a worksheet that Bacanovic gave the SEC in the course of their investigation. Bacanovic claimed that he had used the worksheet during his December 20 conversation with Stewart. The worksheet listed Stewart's holdings and contained numerous handwritten notations in blue ink. The bullet point before ImClone's entry on the worksheet was circled in blue ink, as were the bullet points preceding several other entries on the page. Beside ImClone's name was a notation, "@60," also in blue ink. The "@60" notation was the basis of the charge.

The jury also convicted defendants of conspiracy and obstruction of an agency proceeding in violation of 18 U.S.C. § 1505. With respect to the conspiracy charge, the jury found that the defendants conspired to carry out all three objects of the conspiracy: making false statements, perjury, and obstruction of an agency proceeding.

The prosecution's key witness against both defendants was Bacanovic's former assistant, Douglas Faneuil, who testified pursuant to a cooperation agreement with the Government. Faneuil testified that on the morning of December 27, 2001, he learned that Sam Waksal and several members of Waksal's family were attempting to sell their ImClone holdings. Bacanovic, who was on vacation and out of the office that day, learned of the Waksals'

trading activity when he telephoned Faneuil. Faneuil testified that when he told Bacanovic that Sam Waksal and his daughters wanted to sell their ImClone stock, Bacanovic said: "Oh, my God, get Martha on the phone." Faneuil dialed the telephone number of Stewart's New York office and transferred Bacanovic to Stewart's assistant, Ann Armstrong. Faneuil testified that he did not listen to their ensuing conversation. Later that morning, Bacanovic called Faneuil again. Bacanovic told Faneuil that Stewart would be calling and instructed Faneuil to "tell her what's going on." When Faneuil asked whether that meant that he should tell Stewart "about Sam," Bacanovic replied, "Of course. You must. You've got to. That's the whole point." Faneuil testified that when Stewart called that afternoon, she immediately said: "Hi, this is Martha, what's going on with Sam?" Faneuil responded: "well, we have no news on the company, but Peter thought you might like to act on the information that Sam Waksal was trying to sell all of his shares." Stewart said: "all his shares?" When Faneuil responded that Waksal was attempting to sell all of the shares he held at Merrill Lynch, Stewart asked Faneuil the price of the stock and then instructed him to sell all of her shares. She also asked him whether she held any additional shares of ImClone in her pension accounts, and he told her that she did not. Faneuil offered to e-mail Stewart's assistant, Ann Armstrong, to confirm the sale, which caused Stewart to become angry and inform him that he had no right to tell her assistant about her personal transactions. They then agreed that Faneuil would send an e-mail to Stewart's private e-mail address when her stock was sold. He subsequently placed the order for the sale and e-mailed Stewart when it was completed. Faneuil testified that Bacanovic called later that day, eager to know whether Martha had called and what Faneuil had told her. Faneuil informed Bacanovic that he had told Stewart that Waksal was trying to sell all his shares, and that Stewart had sold hers. Documents in evidence demonstrated that Stewart's ImClone stock had been sold shortly before 2 p.m. on December 27, 2001.

Faneuil also testified that within a few days after the Erbitux announcement, one of his supervisors at Merrill Lynch approached him with questions about the events on December 27. Faneuil called Bacanovic, who was still on vacation at that time. Bacanovic told him that Stewart sold her ImClone shares pursuant to a tax-loss selling plan which Bacanovic and Stewart had developed earlier in December. When Faneuil later learned that the sale actually disrupted Stewart's tax-loss selling because Stewart sold the shares at a significant profit, Faneuil again turned to Bacanovic, who informed him that Stewart sold her ImClone stock pursuant to an agreement they had reached that she would sell if the share price fell to $60. Faneuil testified that this was the first time that he had heard of such a $60 agreement.

Faneuil admitted that he initially lied to investigators about his conversation with Stewart. He testified that in the months following the sale, he felt increasing pressure from Bacanovic not to reveal the truth about the events of December 27. In mid-January, Bacanovic told him: "I've spoken to Martha. I've met with her. And everyone's telling the same story. Everyone's telling the same story. This was a $60 stop-loss order. That was the reason for her sale. We're all on the same page, and it's the truth. It's the true story. Everyone's telling the same story." Faneuil testified that he had similar conversations with Bacanovic at least five times before June 2002, when he decided to correct the statements he had made to

investigators and cooperate with the Government.

Faneuil's direct examination lasted approximately four hours. Defense counsel cross-examined him for more than nine hours over a period of three days, and sought to impeach his credibility through evidence of his prior experiences with Stewart, former drug use, and his cooperation agreement with the Government.

The Government's evidence also included the testimony of Emily Perret, San Waksal's assistant. Perret testified that Stewart called ImClone's New York office on December 27. According to Perret, Stewart immediately said "get Sam, or where is Sam. This is Martha. There is something going on with ImClone. Do you know what it is? I need you to go find him." Perret informed Stewart that she did not know Waksal's whereabouts and had no information about ImClone. Perret recorded the following message in her telephone log: "1:43 Martha Stewart, something is going on with ImClone and she wants to know what She is on her way to Mexico and is staying at Los Ventanos [sic]." Telephone records admitted at trial showed that Stewart placed this call after speaking with Faneuil.

Stewart's assistant, Ann Armstrong, also testified during the Government's case. Armstrong testified that Bacanovic called on the morning of December 27 and asked to speak to Stewart. Armstrong informed him that Stewart was on an airplane en route to Mexico, and typed the following message into her computer message log: "Peter Bacanovic thinks ImClone is going to start trading downward." Armstrong testified that Bacanovic did not say what the price of ImClone was. When Stewart called later that day, Armstrong relayed the message to her, and then transferred her call to Peter Bacanovic's office.

Telephone records corroborated the testimony of Faneuil and Armstrong with respect to the timing and sequence of the telephone conversations which occurred on December 27.

Armstrong also testified that on January 31, 2002, Stewart spoke with her attorney on the telephone, then approached Armstrong and asked to see the message log for December 26 through January 7. After Armstrong opened the document on her computer screen, Stewart seated herself at Armstrong's desk and began scrolling through the messages. When she came to the messages listed for December 27, Stewart deleted the message from Bacanovic, changing it to: "Peter Bacanovic re imclone." Armstrong testified that Stewart then stood up and told Armstrong to "put it back the way it was." This occurred five days before Stewart's interview at the United States Attorney's Office. The Government introduced into evidence the original message log as well as a copy of the altered version which Armstrong had kept.

The Government also presented the testimony of Mariana Pasternak, Stewart's best friend. Pasternak traveled with Stewart to Mexico on December 27, 2001, and testified about a conversation she had with Stewart in Mexico. The two were talking about mutual friends, and the conversation turned to Sam Waksal. Pasternak testified that Stewart said Waksal "was selling or trying to sell his stock, that his daughter was selling or trying to sell her stock, and Merrill Lynch didn't sell." Stewart also stated: "His stock is going down, or went down, and I sold mine." Pasternak also testified that at some point while she and Stewart were still in Mexico, Stewart said: "Isn't it nice to have brokers who tell you those things." On cross-examination, Pasternak stated that she could not recall whether Stewart said this or whether Pasternak herself had merely thought it. On redirect examination, Past-

ernak testified that it was her best belief that Stewart had made the statement. Pasternak's testimony was admitted only against Stewart.

The Government also presented the testimony of Lawrence F. Stewart (hereinafter "Lawrence"), Director of the Forensic Services Division of the United States Secret Service. Lawrence's specialty is ink analysis—he testified that he has been designated the "National Expert for Ink Analysis." At trial, Lawrence introduced the jury to the forensic tests which were performed on the worksheet to determine whether there was any variation in the pens used to make the handwritten notations. His laboratory tested the document twice: in July and August 2002 and January 2004. Lawrence stated that the tests revealed that all but one of the tested notations on the document—including the circle around the ImClone bullet point—were made with an inexpensive type of Paper Mate pen. The exception was the "@60" notation, which was made with a pen Lawrence could not identify. Lawrence testified that while there are scientific tests which can measure the age of ink on a document, they could not be used on the "@60" notation because they require multiple samples of the same ink placed on a document over a span of time. The Government argued, on the basis of the use of different pens, that Bacanovic did not make the "@60" notation at the same time that he made the other notation on the same line.

Lawrence was extensively cross-examined regarding the wording of his laboratory's reports on the worksheet and regarding a mark that his laboratory did not fully test: a small dash beside an entry for "Apple Computer Inc." Lawrence testified that he had not tested this mark because the process of testing necessarily destroys the sample, and he was concerned that by testing the dash he would not leave enough of the sample for the defense to analyze. However, Lawrence did conclude that the dash was not made with a Paper Mate pen, and that it was possible that it was made by the same pen that made the "@60" notation.

Throughout his testimony, Lawrence indicated that he had performed much of the work involved in testing the ink on the worksheet. Lawrence also testified that although another ink examiner, Susan Fortunato, had written the laboratory report on the July 2002 tests, he had participated in those tests, reviewed her work and assisted in the creation of the exhibits prepared for the trial. He also stated that he had participated in the January 2004 testing.

In his defense case, Bacanovic presented the expert testimony of another ink examiner, Dr. Albert Lyter. Lyter used one of the same forensic tests the Secret Service laboratory had used to analyze the worksheet, and agreed with Lawrence's conclusion that the ink used to create the "@60" notation was different from the ink used to create all of the other notations tested by the Government, including the circle around the bullet point preceding the ImClone entry. Lyter did not dispute Lawrence's statement that the comparative age of the entries could not be scientifically determined. Lyter's analysis for the worksheet varied from Lawrence's in only two respects. First, Lyter analyzed the dash beside the Apple Computer entry, and concluded that it was made with the same pen that had made the "@60" entry. Second, Lyter testified that densitometry, a method of statistical analysis based on measurements of ink density, demonstrated that Bacanovic used at least two different Paper Mate pens to make all of the remaining marks on the page. That is, while the pens used to make those notations contained ink of the same recipe,

minor variations in the composition of the inks revealed that they were from different batches, and therefore must have been contained in different pens. This testimony was offered to support the defense's contention that Bacanovic used multiple pens during his conversation with Stewart.

Lawrence returned to the stand during the Government's rebuttal case to explain that densitometry lacks scientific validity. During cross-examination, he was asked whether he was familiar with a proposal for a forensic science textbook by several of his colleagues at the Forensic Services Division, which includes a chapter about the use of densitometry to detect batch variations in inks of the same recipe. Lawrence stated that he had seen the textbook proposal.

Bacanovic's lawyer spent the majority of his time during summation attacking Faneuil's credibility and pointing out inconsistencies in his testimony. With respect to the worksheet, Bacanovic's lawyer stated, among other things: "We had a lot of expert testimony about this document. But our expert and their expert really agreed on almost everything about the main important points." (Tr. at 4657) Stewart's lawyer conceded during his closing argument that Faneuil's testimony concerning what he told Stewart on December 27 was accurate: "Nobody is disputing whether or not Ms. Stewart was told that the Waksals were selling on December 27th. What we are disputing is that it made a difference to her." (Tr. at 4762)

After a five-week trial, the jury returned the verdict described above. Two conclusions relevant to the current motions can be drawn from the jury's verdict: first, that the jury found that the Government had not proved beyond a reasonable doubt that defendants had fabricated the $60 agreement; and second, that the jury found beyond a reasonable doubt that Stewart and Bacanovic agreed to lie and

did lie to Government investigators to conceal the fact that when Stewart sold her ImClone stock on December 27, 2001, she had been tipped by Bacanovic's assistant that the CEO of ImClone was trying to sell his ImClone shares held at Merrill Lynch.

On May 21, 2004, the Government announced that it had filed a criminal complaint against Lawrence Stewart after an investigation revealed that he had made false statements in his trial testimony. On June 9, Lawrence was indicted on two counts of perjury. Lawrence is not accused of lying about the results of the forensic tests performed on the worksheet, but rather about two other matters: his claim that he had personally participated in the tests and his statement that he had seen the textbook proposal drafted by his colleagues.

After the Government's announcement, defendants made these motions for a new trial. Defendants' primary claim is that Lawrence's perjury constitutes newly-discovered evidence which justifies a new trial. Defendants also contend that the Government's failure to turn over materials which revealed that Lawrence was committing perjury constituted a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that defendants' inability to cross-examine the examiner who tested the ink, Susan Fortunato, was a violation of their Confrontation Clause rights. Each of these arguments is considered in turn.

## DISCUSSION

### I. *Perjury by a Government Witness*

■ Rule 33 provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R.Cr.P. 33(a). However, "in the interest

of according finality to a jury's verdict, a motion for a new trial based on previously-undiscovered evidence is ordinarily 'not favored and should be granted only with great caution.'" *United States v. Stofsky,* 527 F.2d 237, 243 (2d Cir.1975) (quoting *United States v. Costello,* 255 F.2d 876, 879 (2d Cir.1958)). In most situations, therefore, "relief is justified under Rule 33 only if the newly-discovered evidence could not have been discovered, exercising due diligence, before or during trial, and that evidence 'is so material and non-cumulative that its admission would probably lead to an acquittal.'" *United States v. Gallego,* 191 F.3d 156, 161 (2d Cir.1999) (quoting *United States v. Siddiqi,* 959 F.2d 1167, 1173 (2d Cir.1992)).

When the newly-discovered evidence is offered to show that a witness has committed perjury, the second half of the Rule 33 analysis is slightly different. The threshold inquiry is whether the witness actually committed perjury. *See United States v. White,* 972 F.2d 16, 20 (2d Cir.1992). Although Lawrence has only been indicted, not convicted, it is assumed for the purpose of these motions that he did perjure himself.

 But the mere fact that a witness committed perjury is insufficient, standing alone, to warrant relief under Rule 33. "Whether the introduction of perjured testimony requires a new trial initially depends on the extent to which the prosecution was aware of the alleged perjury. To prevent prosecutorial misconduct, a conviction obtained when the prosecution's case includes testimony that was known or should have been known to be perjured must be reversed if there is any reasonable likelihood that the perjured testimony influenced the jury." *United States v. Damblu,* 134 F.3d 490, 493 (2d Cir.1998) (citing *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). When the Government is unaware of the

perjury at the time of trial, "a new trial is warranted only if the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991) (quoting *Sanders v. Sullivan,* 863 F.2d 218, 226 (2d Cir.1988)) (alteration in original).

*Wallach* is one of the few Second Circuit cases to hold that witness perjury required a new trial. In that case, the Court determined that the Government knew or should have known that a cooperating witness, who had testified that he had conquered a compulsive gambling habit, lied when confronted on cross-examination with evidence that contradicted his claim. *See id.* at 457. The Court held that a new trial was required because the witness was "the centerpiece of the government's case" who "tied all the pieces together." *Id.* at 457, 458. The Court further held that "[h]ad it been brought to the attention of the jury that [the witness] was lying after he had purportedly undergone a moral transformation and decided to change his ways, his entire testimony may have been rejected by the jury." *Id.* at 457.

The *Wallach* Court also observed that "if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" *Id.* at 456 (citing *Stofsky,* 527 F.2d at 243). But this broad language does not relieve courts of the duty to determine whether the false testimony was prejudicial. Courts in this Circuit have continued to scrutinize the potential effect of witness perjury on a jury's judgment, often assuming, for the purpose of the analysis, that the prosecution knew or should have known of the perjury. *See, e.g., Gallego,* 191 F.3d at 166 n. 4; *United States v. Wong,* 78 F.3d 73, 82 (2d Cir. 1996). Since *Wallach,* the Second Circuit

has noted that even when the prosecution knew a witness was committing perjury, "where independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial." *Wong,* 78 F.3d at 82.

A. *The Prosecution's Awareness of Lawrence's Perjury*

■ Defendants argue that Lawrence and several of his laboratory colleagues were members of the prosecution team, and that their knowledge of Lawrence's perjury should be imputed to the prosecution. Defendants also argue that a number of "red flags" in Lawrence's testimony should have alerted the prosecution that Lawrence was committing perjury. For these reasons, defendants contend, the "reasonable likelihood" standard applies in this case and requires that they receive a new trial.

The following facts, drawn from materials submitted by defendants and by the Government, demonstrate that Lawrence participated in the prosecution of this case as an ordinary expert witness. His colleagues at the Secret Service laboratory were even less involved. None of them was a member ·of the prosecution team.

In July 2002, the FBI sent the worksheet to the Secret Service laboratory with a request for analysis. Fortunato received the worksheet and performed the tests. Lawrence's first involvement with the case came in the fall and winter of 2003, when he accompanied FBI agents who were supervising defense experts' collection of ink samples from the worksheet. Lawrence's role, according to affidavits submitted by the agents, was to advise them concerning proper collection techniques to ensure that the defense experts would not damage the worksheet. On January 9, 2004, Lawrence, Fortunato, and Benjamin Moore, another civilian employee of the Secret

Service laboratory, met the prosecuting attorneys for the first time. At that meeting, Lawrence and Fortunato explained the ink tests performed on the worksheet and the results. They also discussed their credentials. Lawrence explained age testing to the prosecutors and why it was not possible to use such tests on the worksheet. The participants in this meeting also discussed why the dash beside the Apple Computer entry was not tested. The prosecutors requested that Lawrence and Fortunato attempt to test the dash as well as identify the actual inks used on the document. According to affidavits submitted by the prosecutors, Moore did not participate in the meeting in a substantive way.

After the prosecutors decided to call Lawrence as an expert witness, they met with him two more times before trial. Moore was also in attendance, but again did not participate substantively. In the first meeting, which the prosecutors had organized as an initial trial preparation session, Lawrence again discussed the tests performed on the worksheet and age testing. He also discussed past testimony by Bacanovic's likely expert witnesses. The second meeting was devoted to trial preparation, including mock direct and cross-examinations. In addition to these meetings, FBI agents spoke with Lawrence several times by telephone, primarily to arrange his attendance at the meetings. The prosecutor in charge of Lawrence's direct testimony also spoke with him by telephone concerning exhibits and documents produced in discovery.

Lawrence testified in the Government's case in chief on February 19. Subsequently, the prosecutors consulted him about scientific articles that Bacanovic had submitted in response to a *Daubert* challenge and about the formulation of technical questions for Lyter's cross-examination.

Lawrence sat in the courtroom on February 23 when the defense expert, Lyter, testified. The prosecutor who conducted the cross-examination affirmed that notes containing possible cross-examination questions were passed to him during his cross-examination of Lyter, and that he later learned that the notes came from Lawrence. The prosecutor did not request such assistance and did not recall whether he asked the suggested questions. Lawrence also met with prosecutors to prepare for his rebuttal testimony. Lawrence testified in the Government's rebuttal case on February 26.

Lawrence did not assist the FBI, the SEC, or the United States Attorney's Office in investigating Stewart's stock sale. He did not participate in the interviews of the defendants, or in any of the hundreds of other interviews conducted in the course of the Government's investigations. Other than the worksheet and reports related to it, he reviewed no documents in this case. He did not assist the Government in preparing the case for submission to the grand jury. Indeed, he had no contact with the case until several months after the Indictment had been returned, while the parties were preparing for trial. His contribution to trial strategy was limited to helping the prosecution understand the forensic tests which had been performed on the document and assisting the attorneys in formulating cross-examination questions on technical subjects. It is not unusual for expert witnesses to perform such duties. Nor is it unusual for them to prepare for trial by undergoing mock examinations, or to observe the testimony of adverse witnesses. *See Malek v. Fed'l Ins. Co.*, 994 F.2d 49, 53–54 (2d Cir.1993) (discussing the applicability to expert witnesses of a provision of the Federal Rules of Evidence which permits exceptions from the rule that witnesses should be sequestered during trial).

The numerous documents defendants have submitted, including text messages which Lawrence sent to other Secret Service employees from his mobile telephone prior to and during the trial, do not reveal any greater level of participation by Lawrence in the prosecution of this case than what has been described above. Stripped of defendants' rhetoric, the facts advanced by both sides demonstrate that Lawrence was an expert witness who was also a Government employee. He was not a member of the Government "team" which investigated and prosecuted defendants. Defendants cite numerous cases which consider whether a Government agent should be deemed an arm of the prosecution, such that his knowledge should be imputed to the prosecuting attorneys. Those cases do not support the broad theory of imputation which defendants advocate. They involve individuals who either worked in the same office as the prosecutor or were law enforcement officers who were actually involved in the investigation of the defendant. In *United States v. Morell*, 524 F.2d 550 (2d Cir.1975), for example, a case on which defendants rely heavily, the Second Circuit imputed to the prosecution a law enforcement agent's knowledge of a confidential file concerning the Government's principal witness, because the agent "not only supervised [the principal Government witness] and participated actively in this investigation, but also was present at counsel's table throughout all or most of the trial, indicating that he was intimately involved in the prosecution," *id.* at 555. *See also United States v. Sanchez*, 813 F.Supp. 241, 247 (S.D.N.Y. 1993), *aff'd on other grounds*, 35 F.3d 673 (2d Cir.1994) (imputing to the prosecutor knowledge of the perjury of local police officers who had been deputized as federal agents and worked as part of a joint task force investigating a narcotics conspiracy of which the defendant was charged as a

member); *Pina v. Henderson,* 752 F.2d 47, 49 (2d Cir.1985) (distinguishing *Morell* and refusing to impute to the prosecutor knowledge possessed by a parole officer "who did not work in conjunction with either the police or the prosecutor"). Defendants have cited two state court cases for the proposition that expert witnesses can be considered members of the prosecution team. *See People v. Cornille,* 95 Ill.2d 497, 69 Ill.Dec. 945, 448 N.E.2d 857 (1983); *State v. DeFronzo,* 59 Ohio Misc. 113, 394 N.E.2d 1027 (Com.Pl.1978). All of these cases establish that the inquiry into whether knowledge of witness perjury should be imputed to a prosecuting attorney is a highly fact-specific one. The question is not whether any expert witness can be treated as "an arm of the prosecution," but whether Lawrence played such a role. The facts of this case demonstrate that he did not. Accordingly, his knowledge of his own perjury cannot be imputed to the prosecution.[2]

Defendants argue, alternatively, that the prosecutors should have been aware that Lawrence was committing perjury. They point to a number of "red flags" which, they claim, should have alerted prosecutors before trial to the possibility that Lawrence was misrepresenting his participation in the testing of the worksheet. These include the absence of Lawrence's name on any Secret Service records pertaining to the laboratory's testing of the worksheet, and what defendants characterize as an absence of any coherent explanation for the failure to test the dash. Defendants also contend that Fortunato informed the prosecutors at their first meeting that she had performed the analysis of the worksheet and that Lawrence informed them of the limits of his participation in the first round of testing.

Defendants have failed to point to anything in the voluminous documents they have submitted which should have alerted the prosecutors that the director of the Secret Service laboratory was lying about his participation in the testing of the worksheet. Neither have defendants shown that the prosecutors were negligent in failing to investigate the extent of his participation. The fact that Lawrence's name appeared nowhere on the laboratory's reports and tests is not inconsistent with his representation that he worked in conjunction with Fortunato; it is also information that was equally available to the defense during trial. Documents offered by the Government demonstrate that nothing which Fortunato and Lawrence said before trial concerning the laboratory's failure to test the dash should have caused the prosecutors to question Lawrence's role; that defendants believe their explanations are not coherent does not establish that the Government should have viewed them the same way. Fortunato's description of the initial meeting, gleaned from a statement she made during the Secret Service investigation into Lawrence's perjury, does not demonstrate, as defendants suggest, that she informed the prosecution that she alone performed the initial round of tests. And finally, defendants rely heavily on Lawrence's own statements regarding what he said to the prosecutors about his role in the testing. Lawrence made these statements in response to questioning by Secret Service agents who were investigat-

---

**2.** Defendants' arguments that Fortunato, Moore, and other Secret Service employees should be considered members of the prosecution team are even weaker. Fortunato performed the initial tests on the worksheet with little contact with the investigators in this case and no contact with the prosecutors. She then met with the prosecutors once to explain the results of those tests. Moore was merely an observer who did not participate in meetings with the prosecution in any meaningful way. The prosecutors neither knew of nor requested his attendance at trial.

ing him for perjury. Defendants fail to explain why such statements are entitled to any credence. Accordingly, defendants have not shown that the Government failed to "properly utilize[ ] the available information" regarding Lawrence's participation in the testing of the worksheet. *Wallach,* 935 F.2d at 457.

■ With respect to Lawrence's perjury regarding his awareness of his colleagues' book proposal, defendants do not contend that any "red flags" should have warned the Government that Lawrence was lying. Bacanovic's attorney elicited the statement on cross-examination. "Where the challenged false testimony was elicited by the defense, rather than the prosecution, that circumstance tends to establish the government's unawareness of the perjury." *Damblu,* 134 F.3d at 493. Accordingly, it is clear that the Government had no reason to be aware of this perjury.

## B. *The Effect of Lawrence Stewart's Perjury on the Jury's Judgment*

■ Defendants have failed to demonstrate that the prosecution knew or should have known of Lawrence's perjury. However, even under the stricter prejudice standard applicable when the Government is aware of a witness's perjury, defendants' motions fail. There is no reasonable likelihood that knowledge by the jury that Lawrence lied about his participation in the ink tests and whether he was aware of a book proposal could have affected the verdict.

### 1. *The Jury Did Not Rely on Lawrence Stewart's Testimony To Convict Defendants*

The verdict, the nature of Lawrence's perjury, and the corroboration that Lawrence's substantive testimony received from the defense's expert demonstrate that Lawrence's misrepresentations could have had no effect on defendants' convictions.

First, the jury found that the Government did not satisfy its burden of proof on the charges to which Lawrence's testimony was relevant. Defendants do not dispute that Bacanovic was acquitted of the charge of making and using a false document, and that none of the false statement and perjury specifications concerning the existence of the $60 agreement were found by the jury to have been proved beyond a reasonable doubt. Instead, the jury found that Stewart lied when she told investigators that she spoke to Bacanovic on December 27 and instructed him to sell her shares after he informed her that ImClone was trading below $60 per share, that she could not remember whether she had been told about Waksal's attempted sale, that she sold her stock because she did not want to be bothered during her vacation, that she discussed MSLO and K–Mart with Bacanovic on December 27, and that she did not discuss the ImClone investigations with Bacanovic. The jury found that Bacanovic lied when he said he spoke to Stewart on December 27 and when he said that the message he left with Armstrong only quoted the market price of ImClone shares. In other words, the jury convicted defendants of lies that had nothing to do with the $60 agreement. The outcome would have been no different had Lawrence's entire testimony been rejected by the jury, or had Lawrence not testified at all.

This situation is similar to *White,* where the defendant claimed that one of the Government's principal witnesses had lied when he testified that he did not abuse drugs. The Second Circuit determined that under either prejudice standard, the allegedly perjured testimony would not have affected the verdict, because the jury had acquitted the defendant of all of the charges for which the only evidence was the testimony of the challenged witness. *See White,* 972 F.2d at 22.

Defendants argue that acquittal on some charges does not establish that the jury completely disregarded Lawrence's testimony. They contend that the $60 agreement constituted Stewart and Bacanovic's core defense and that the "@60" notation was evidence which supported that defense; thus, to the extent that awareness of Lawrence's perjury could have caused the jury to discredit his testimony and have greater confidence in the existence of the agreement and the validity of the notation, the jury would have been more willing to believe defendants' version of the events.

This argument is wholly speculative and logically flawed. The existence of the $60 agreement would not have exonerated defendants. It would not have been inconsistent for the jury to find that defendants did make the $60 agreement, but that the agreement was not the *reason* for the sale. Defendants do not persuasively explain how knowledge of Lawrence's lies could have made the jury more likely to believe that the agreement was the reason for the sale.

Second, Lawrence's false statements were entirely collateral to the substance of his testimony and to defendants' culpability for the crimes charged. Courts have consistently held that no new trial is warranted under Rule 33 when the allegedly perjured testimony comes from a witness who is not key to the prosecution's case or when the perjury touches on matters collateral to the facts in dispute or to the defendants' guilt or innocence. *See, e.g., Gallego,* 191 F.3d at 166 n. 4 (affirming the district court's denial of the defendant's Rule 33 motion and noting that the witness in question was not key to the prosecution's case); *Wong,* 78 F.3d at 82 (remarking that the supposedly perjured testimony, concerning whether the witness had filed a tax return for the previous year, was a collateral matter not relevant to the

guilt or innocence of the defendant); *United States v. Reyes,* 49 F.3d 63, 68 (2d Cir.1995) (affirming the district court's determination that evidence that a Drug Enforcement Agency agent may have committed perjury when testifying against the defendant did not warrant a new trial because the new evidence "did not refute" any of the agent's testimony against the defendant, and "was of marginal significance").

Defendants attempt to characterize Lawrence as central to the prosecution's case and his misrepresentations as critical to the Government's "core theory" that the $60 agreement was a fabrication. As an initial matter, defendants overstate the importance of the $60 agreement to this prosecution. That a $60 agreement was the reason for Stewart's sale was only one of many lies defendants were charged with telling investigators to conceal that Stewart sold her stock because of Bacanovic's tip. The evidence against defendants, defendants' own closing arguments, and the jury's verdict reveal that before Lawrence's perjury was disclosed, no one considered him the "centerpiece" of the Government's case. Moreover, the appropriate analysis is not the importance of the witness to the prosecution's theory of the case, but "the materiality of the perjury *to the jury's verdict." Wallach,* 935 F.2d at 456 (emphasis added). Lawrence's testimony concerning who performed the forensic tests and his knowledge of a textbook proposal circulated by his colleagues have nothing to do with the validity of the ink tests his laboratory performed or the crimes of which defendants were convicted. While it is true that new impeachment evidence may satisfy the reasonable likelihood standard, as when "a conviction depends on the testimony of ... a witness whose credibility was not attacked on cross-examination," *Wong,* 78 F.3d at 82, this is not such a case. Baca-

novic's lawyer sought to impeach Lawrence's credibility and the quality of the Government's scientific analysis, by, among other things, questioning Lawrence repeatedly concerning the Government's decision not to test the dash beside the Apple Computer entry.

Third, in the words of Bacanovic's lawyer, the prosecution and defense experts "really agreed on almost everything about the main important points." (Tr. at 4657) Lyter agreed that the "@60" notation was made with ink which was different from the rest of the ink the Government had tested and that it was not possible to tell whether the "@60" notation was made at the same time as the other notations. Accordingly, even putting aside indications that the jury did not give credence to Lawrence's testimony, it is clear that the impeachment value of Lawrence's perjury would be severely limited since the most critical aspects of his scientific analysis were corroborated by the defense.

## 2. Evidence Unrelated to Lawrence Stewart's Testimony Supports Defendants' Convictions

In addition to the substantial basis for concluding that the jury's decision could not have been affected by the revelation of Lawrence's misrepresentations, ample evidence unrelated to the $60 agreement or to Lawrence's testimony supports defendants' convictions. Faneuil's testimony supports the jury's determination that defendants lied when they claimed that Stewart spoke to Bacanovic on December 27 and sold her ImClone stock after he informed her that it was trading below $60 per share (Specification Two of Count Two, Specification Two of Count Three, and Specification Three of Count Four). Telephone records support Faneuil's version of events.

Armstrong's testimony concerning the wording of Bacanovic's December 27 message supports the jury's finding that Bacanovic lied about the substance of the message (Specification One of Count Six). Armstrong's testimony concerning Stewart's attempt to alter her telephone message log on January 31 gave powerful support to the jury's finding that Stewart lied five days later when she said she was not sure whether there was a December 27 message from Bacanovic in Armstrong's log (Specification Five of Count Three). Armstrong's testimony was corroborated by the telephone log as well as by her record of Stewart's attempt to alter it.

The testimony of Faneuil, Perret, and Pasternak support the jury's determinations that Stewart lied when she told investigators that she did not recall being informed of Waksal's trading on December 27 (Specification One of Count Four), that she sold her stock because she did not want to be bothered over her vacation (Specification Four of Count Three), and that she and Bacanovic discussed MSLO and K-Mart during their conversation (Specification Three of Count Three). Faneuil testified that he informed Stewart of Waksal's trade and that they did not talk about other stocks. Perret testified that Stewart called that afternoon looking for Waksal and asking questions about ImClone, which supports an inference that she was given information about Waksal and ImClone, not merely a market price. And Pasternak testified that only a few days after December 27, Stewart informed her that Waksal had sold his ImClone stock and that Stewart had sold hers.

Finally, Faneuil's testimony supports the jury's determination that Stewart lied when she claimed not to have spoken with Bacanovic about the Government investigation into ImClone trading or Stewart's ImClone trade (Specifications Six and Seven of Count Three). Faneuil stated that Bacanovic repeatedly told him in January

2002 and afterward that Bacanovic had spoken to Stewart and that everyone was "on the same page."

The ample evidence of defendants' false statements and Bacanovic's perjury also supports defendants' convictions for conspiracy and obstruction of an agency proceeding. It is clear from the trial record that the worksheet and evidence concerning the $60 agreement were only part of the substantial evidence that defendants conspired, obstructed an SEC investigation, and lied in order to conceal what Stewart learned right before her sale of ImClone stock.

### 3. *Defendants' Remaining Arguments*

Defendants attempt to evade these serious problems by making a more sweeping argument. They contend that because Lawrence was not simply a Government witness, but an employee of the Government who participated in the prosecution of the case, the revelation of his perjury would have caused the jury to question the credibility of other Government agents and employees who testified in the case.

■ Even assuming that the jury would have viewed Lawrence as a member of the prosecution team, defendants' argument is unpersuasive. It depends on an inaccurate characterization of the Government's case as relying heavily on the testimony of Government employees. Special Agent Catherine Farmer and SEC attorney Helene Glotzer, the principal "Government agent" witnesses, testified only to the fact of defendants' having made the statements attributed to them in the Indictment.[3] Fa-

neuil, Armstrong, and Pasternak, among others, provided evidence of the falsity of those statements. In other words, Stewart was convicted on the testimony of Bacanovic's assistant, her own assistant, and her best friend. Bacanovic was convicted on the testimony of Stewart's assistant and his own assistant.

It should be noted that Armstrong and Pasternak were not eager witnesses. On the first day of Armstrong's testimony, the trial was adjourned early because the witness broke down on the witness stand. Pasternak's demeanor evinced her obvious reluctance to testify for the Government. Defendants do not explain how Lawrence's perjury could have affected the jury's assessment of the credibility, truthfulness, and motivations of those critical witnesses.

Furthermore, it is simply not plausible that Lawrence's dishonesty concerning collateral matters would cause the jury to question the substance of Farmer and Glotzer's testimony. Again, the core of Lawrence's testimony was substantiated by Bacanovic's expert. His tangential misrepresentations would therefore have an extremely limited capacity to impugn the factual testimony of other Government employees.

Defendants have cited no case which supports the proposition that collateral perjury by a Government employee should be presumed to have a greater likelihood of affecting the jury's judgment than similar perjury by other witnesses. Indeed, the case law in this Circuit suggests otherwise. In *Reyes*, the defendant moved for a

---

**3.** Another Government employee, Special Agent Michael Ryan of the FBI, testified concerning his review of telephone records, e-mail messages, and other documents.

It should also be noted that Glotzer's testimony as to Bacanovic's statements in his January 7 interview was corroborated by the testimony of Brian Schimpfhauser, a Merrill Lynch employee who was also present at the interview. With regard to Bacanovic's sworn testimony on February 13, Glotzer testified only as to the accuracy of the recording played for the jury. Furthermore, Farmer's contemporaneous notes of Stewart's interviews, used by Farmer and Glotzer when testifying, were available to the defense.

new trial on the basis of allegations that a Drug Enforcement Agency agent who testified at his trial had committed perjury in other cases. The Second Circuit affirmed the district court's denial of the motion, without reference to the witness's status as a participant in the investigation of the defendant, because the allegations raised concerns only about the agent's credibility, not the substance of his testimony, and because the agent's testimony was "of marginal significance." *Reyes,* 49 F.3d at 68. In *United States v. Rosner,* 516 F.2d 269 (2d Cir.1975), the defendant argued that the prosecution was responsible for the perjury of an undercover New York City police officer because the officer was "part of that prosecution," *id.* at 279. While agreeing with the defendant that the agent was not "an ordinary witness," the Court nevertheless agreed with the trial court that "the perjury was unrelated to the issues being tried and was related, on the contrary, only to collateral and cumulative impeaching material concerning the witness' own past misconduct." *Id.* Defendants offer no persuasive justification for creating a new rule to govern collateral perjury by Government employees who are not involved in the investigation of a case.

Defendants also contend that discovery obtained from the Government in connection with these motions demonstrates that Lawrence lied about a third matter: that he disagreed with Fortunato's decision not to test the dash beside the Apple Computer entry. But defendants fail to explain how the revelation of this perjury—if in fact it is perjury—could have affected the verdict. Defendants cannot escape the fact that the jury acquitted Bacanovic of Count Five and both defendants of making false statements relating to the existence of the $60 agreement, and the fact that ample evidence supports the charges of which the jury convicted defendants. Moreover, Bacanovic availed himself of the opportunity to cross-examine Lawrence at length about the laboratory's decision not to test the dash, and may have succeeded thereby in creating sufficient doubt about the laboratory's method of conducting its tests to persuade the jury to acquit Bacanovic of the false document charge.

■ Defendants also argue that the Indictment charging Lawrence with perjury supports their contention that his statements were material. Defendants appear to reason that because materiality is an essential element of the crime of perjury, the Indictment constitutes an admission on the Government's part that Lawrence's statements affected the jury's judgment. However, the return of an Indictment does not relieve a district court of the obligation of assessing, for the purposes of a Rule 33 motion, whether there is a reasonable likelihood that the perjury could have influenced the jury. In this case, I have found that there is no reasonable likelihood that Lawrence's perjury could have influenced the jury.

## II. *Brady Violations*

■ Defendants also contend that the Government violated *Brady* by suppressing evidence favorable to defendants. Specifically, defendants argue that the Government failed to turn over evidence which demonstrated that Lawrence had lied about his participation in the forensic tests performed on the worksheet and his awareness of his colleagues' book proposal, and evidence which demonstrated that Lawrence had criticized and disagreed with Fortunato's decision not to test the Apple Computer dash.

■ Under *Brady,* "the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States v. Jackson,* 345 F.3d 59, 70 (2d Cir.2003) (quoting *In*

*re United States,* 267 F.3d 132, 139 (2d Cir.2001)). Favorable evidence includes evidence that "is useful to impeach the credibility of a government witness." *Id.* (quoting *In re United States,* 267 F.3d at 139). The "touchstone of materiality is a 'reasonable probability' of a different result." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

For the reasons discussed above, defendants have failed to show that the prosecution was aware of Lawrence's perjury, and have failed to show a reasonable probability that, had the evidence of his perjury come to light, the outcome of their trial would have been different. For similar reasons, they have also failed to show that evidence that Lawrence disagreed with some aspects of Fortunato's original report is material under *Brady.* Therefore, the Government's failure to turn over such evidence to the defense does not constitute a *Brady* violation.

### III. *Confrontation Clause Violations*

Defendants also argue that the fact that the Government did not call as a witness Susan Fortunato, the Secret Service ink examiner who actually tested the worksheet, violated their Confrontation Clause rights under the rule established in *Crawford v. Washington,* —— U.S. ——, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In *Crawford,* a recorded statement taken by the police from the defendant's wife was admitted into evidence by the trial court, notwithstanding that the state's marital privilege barred her from testifying at the trial. *See id.* at 1358–59. The Supreme Court held that the admission of the wife's statement was a violation of the Confrontation Clause. In this case, no statement of Susan Fortunato was received in evidence. Thus, there is no Confrontation Clause issue.

### CONCLUSION

For the foregoing reasons, defendants' motions for a new trial are denied. Defendants have not demonstrated how additional discovery or a hearing would assist in the determination of these motions. Accordingly, their requests for additional discovery and an evidentiary hearing are also denied.

SO ORDERED.

### *APPENDIX A*

S1 03 Cr. 717 (MGC)

### *REDACTED SUPERSEDING INDICTMENT*

KELLEY, District Judge.

### *COUNT ONE*

(Conspiracy to Obstruct Justice, Make
False Statements, and Commit
Perjury)

The Grand Jury charges:

### *BACANOVIC's False Statements on January 7, 2002*

1. On or about January 7, 2002, in New York, New York, SEC staff attorneys interviewed PETER BACANOVIC by telephone. In furtherance of the conspiracy, and with the intent and purpose to conceal and cover up that BACANOVIC had caused STEWART to be provided information regarding the sale and attempted sale of the Waksal Shares and that STEWART had sold her ImClone stock while in possession of that information, BACANOVIC concealed and covered up the following facts that were material to the SEC's investigation, among others:

a. BACANOVIC stated that on December 27, 2001, STEWART had spoken to BACANOVIC, that he told STEWART that ImClone's price had dropped below $60 per share, and that STEWART placed

her order to sell her ImClone stock with him. This statement concealed and covered up that Faneuil conveyed information to STEWART regarding the sale and attempted sale of the Waksal Shares.

*STEWART's False Statements
on February 4, 2002*

2. On or about February 4, 2002, MARTHA STEWART, accompanied by her lawyers, was interviewed in New York, New York by the SEC, the FBI, and the U.S. Attorney's Office. In furtherance of the conspiracy, and with the intent and purpose to conceal and cover up that BACANOVIC had caused STEWART to be provided information regarding the sale and attempted sale of the Waksal Shares and that STEWART had sold her ImClone stock while in possession of that information, STEWART concealed and covered up the following material facts, among others:

a. STEWART stated that she did not know whether the phone message BACANOVIC left for STEWART on December 27, 2001 was recorded in the phone message log maintained by her assistant. This statement was false and misleading in that, as STEWART well knew but concealed and covered up, the message was recorded in the phone message log, the substance of which—"Peter Bacanovic thinks ImClone is going to start trading downward"— STEWART had reviewed when she temporarily altered the message four days before the interview.

b. STEWART stated that on December 27, 2001, STEWART spoke to BACANOVIC, who told her that ImClone was trading a little below $60 per share and asked STEWART if she wanted to sell. STEWART stated that after being informed of ImClone's stock price, she directed BACANOVIC to sell her ImClone shares that day because she did not want to be bothered over her vacation. These

statements were false and misleading in that, as STEWART well knew but concealed and covered up, STEWART spoke to Faneuil, not BACANOVIC, on December 27, 2001, and STEWART sold her ImClone shares that day after Douglas Faneuil conveyed to her information regarding the sale and attempted sale of the Waksal Shares.

c. STEWART stated that before concluding their telephone conversation on December 27, 2001, BACANOVIC and STEWART discussed "how MSLO·stock was doing" and Kmart. STEWART provided these false details of her purported conversation with BACANOVIC to conceal and cover up the fact that STEWART spoke on December 27, 2001 to Douglas Faneuil, who conveyed to her information regarding the sale and attempted sale of the Waksal Shares.

d. STEWART stated that, during the period from December 28, 2001 to the date of the interview, February 4, 2002, STEWART had only one conversation with BACANOVIC regarding ImClone, in which only publicly disclosed matters in the "public arena" were discussed. STEWART further stated that although BACANOVIC mentioned that Merrill Lynch had been questioned by the SEC regarding trading·in ImClone generally, BACANOVIC did not inform STEWART that he had been questioned by the SEC or that he had been questioned regarding STEWART's account. STEWART made these false statements to conceal and cover up that she and BACANOVIC had agreed to provide false information to the SEC, the FBI, and the U.S. Attorney's Office.regarding STEWART's sale of ImClone stock and conceal and cover up that BACANOVIC had caused STEWART to be provided information regarding the sale and attempted sale of the Waksal Shares and that STEWART had sold her ImClone

stock while in possession of that information.

### STEWART's False Statements on April 10, 2002

3. On or about April 10, 2002, MARTHA STEWART was interviewed by telephone by the SEC, the FBI, and the U.S. Attorney's Office, the representatives of which were in New York, New York. In furtherance of the conspiracy, and with the intent and purpose to conceal and cover up that PETER BACANOVIC had caused STEWART to be provided information regarding the sale and attempted sale of the Waksal Shares and that STEWART had sold her ImClone stock while in possession of that information, STEWART concealed and covered up the following material facts, among others:

a. STEWART stated that on December 27, 2001, STEWART spoke to BACANOVIC, who told her that ImClone was trading below $60 per share and suggested that STEWART sell her ImClone shares. These statements were false and misleading in that, as STEWART well knew but concealed and covered up, STEWART spoke to Faneuil, not BACANOVIC, on December 27, 2001, and STEWART sold her ImClone shares that day after Douglas Faneuil conveyed to her information regarding the sale and attempted sale of the Waksal Shares.

### The Conspiracy

4. From in or about January 2002 until in or about April 2002, in the Southern District of New York and elsewhere, PETER BACANOVIC and MARTHA STEWART, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit: to obstruct justice, in violation of Section 1505 of Title 18, United States Code; to make false statements, in violation of Section 1001 of Title 18, United States Code; and to commit perjury, in violation of Section 1621 of Title 18, United States Code.

### Objects of the Conspiracy

#### Obstruction of Justice

5. It was a part and an object of the conspiracy that MARTHA STEWART and PETER BACANOVIC, and others known and unknown, unlawfully, willfully and knowingly, would and did corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, namely, an investigation by the SEC, in violation of Title 18, United States Code, Section 1505.

#### False Statements

6. It was further a part and an object of the conspiracy that MARTHA STEWART and PETER BACANOVIC, and others known and unknown, unlawfully, willfully and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, would and did falsify, conceal, and cover up by trick, scheme, and device material facts, and make materially false, fictitious, and fraudulent statements and representations, and make and use false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in violation of Title 18, United States Code, Section 1001.

#### Perjury

7. It was further a part and an object of the conspiracy that PETER BACANOVIC, having taken an oath before a competent tribunal, officer and person, in a case

in which the law of the United States authorizes an oath to be administered, namely, in testimony before the SEC, that he would testify, declare, depose and certify truly, and that any written testimony, declaration, deposition and certificate by him subscribed, would be true, unlawfully, willfully, knowingly, and contrary to such oath, would and did state and subscribe material matters which he did not believe to be true, in violation of Title 18, United States Code, Section 1621.

### Overt Acts

8. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On January 7, 2002, in New York, New York, PETER BACANOVIC provided false and misleading information to the SEC regarding the December 27, 2001 sale of ImClone stock by MARTHA STEWART.

b. In January 2002, PETER BACANOVIC in New York, New York, encouraged Douglas Faneuil to refrain from disclosing that Faneuil had informed MARTHA STEWART on December 27, 2001 of the sale and attempted sale of the Waksal Shares.

c. On or about January 30, 2002, in New York, New York, PETER BACANOVIC provided the altered Worksheet to a Merrill Lynch manager with the intent that the Worksheet be produced to the SEC.

d. On February 4, 2002, in New York, New York, MARTHA STEWART made false and misleading statements to the SEC, the FBI, and the U.S. Attorney's Office regarding her December 27, 2001 sale of ImClone stock.

e. On February 13, 2002, in New York, New York, PETER BACANOVIC gave false and misleading testimony regarding MARTHA STEWART's December 27, 2001 sale of ImClone stock.

f. On April 10, 2002, in New York, New York, MARTHA STEWART made false and misleading statements to the SEC, the FBI, and the U.S. Attorney's Office regarding her December 27, 2001 sale of ImClone stock.

(Title 18, United States Code, Section 371).

### COUNT TWO

(False Statements by Peter Bacanovic)

The Grand Jury further charges:

9. The allegations of paragraph 1 are repeated and realleged as though fully set forth herein.

10. On or about January 7, 2002, in the Southern District of New York, PETER BACANOVIC unlawfully, willfully, and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, falsified, concealed, and covered up by trick, scheme, and device material facts, and made materially false, fictitious, and fraudulent statements and representations, to wit, BACANOVIC participated in an interview by telephone with SEC staff attorneys in New York, New York, in which he made the following false statements and concealed and covered up facts that were material to the SEC's investigation:

### Specification One

BACANOVIC falsely stated that on December 20, 2001, he had a conversation with STEWART in which she decided to sell her ImClone stock at $60 per share.

### Specification Two

BACANOVIC falsely stated that he had a conversation with MARTHA STEWART on December 27, 2001, in which he told STEWART that ImClone's stock price had dropped and STEWART told him to sell her ImClone stock.

(Title 18, United States Code, Sections 1001(a)(1) and (2)).

### COUNT THREE

(False Statements by Martha Stewart)

The Grand Jury further charges:

11. The allegations of paragraph 2 are repeated and realleged as though fully set forth herein.

12. On or about February 4, 2002, in the Southern District of New York, MARTHA STEWART unlawfully, willfully, and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, falsified, concealed, and covered up by trick, scheme, and device material facts, and made materially false, fictitious, and fraudulent statements and representations, to wit, STEWART participated in an interview with the SEC, the FBI, and the U.S. Attorney's Office for the Southern District of New York in New York, New York, in which she made the following false statements and concealed and covered up facts that were material to the investigations:

### Specification One

STEWART falsely stated that in a conversation that had occurred at a time when ImClone was trading at $74 per share, STEWART and BACANOVIC decided that STEWART would sell her shares when ImClone started trading at $60 per share.

### Specification Two

STEWART falsely stated that on December 27, 2001, at approximately 1:30 p.m. (EST), STEWART spoke to BACANOVIC, who told STEWART that ImClone was trading a little below $60 per share and that he asked STEWART if she wanted to sell, and then STEWART told BACANOVIC to sell her shares.

### Specification Three

STEWART falsely stated that before ending her call with BACANOVIC on December 27, 2001, STEWART and BACANOVIC had discussions regarding what MSLO stock was doing and regarding Kmart.

### Specification Four

STEWART falsely stated that she decided to sell her ImClone stock on December 27, 2001 because she did not want to be bothered over her vacation.

### Specification Five

STEWART falsely stated that she did not know if there was a phone message from BACANOVIC on December 27, 2001 in the log of telephone messages maintained by her assistant.

### Specification Six

STEWART falsely stated that since December 28, 2001, she had only one conversation with BACANOVIC regarding ImClone, in which they only discussed matters in the "public arena."

### Specification Seven

STEWART falsely stated that since December 28, 2001, BACANOVIC mentioned to STEWART in a telephone conversation that Merrill Lynch had been questioned by the SEC regarding ImClone, but did not tell STEWART that he had been ques-

tioned by the SEC or that he had been questioned by the SEC regarding STEWART's account.

(Title 18, United States Code, Sections 1001(a)(1) and (2)).

## COUNT FOUR

(False Statements by Martha Stewart)

The Grand Jury further charges:

13. The allegations of paragraph 3 are repeated and realleged as though fully set forth herein.

14. On or about April 10, 2002, in the Southern District of New York, MARTHA STEWART unlawfully, willfully, and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, falsified, concealed, and covered up by trick, scheme, and device material facts, and made materially false, fictitious, and fraudulent statements and representations, to wit, STEWART participated in an interview with the SEC, the FBI, and the U.S. Attorney's Office for the Southern District of New York in New York, New York, in which she made the following false statements and concealed and covered up facts that were material to the investigations:

### Specification One

STEWART falsely stated that she did not recall if she and BACANOVIC discussed Samuel Waksal on December 27, 2001, nor did she recall being informed on December 27, 2001 that any of the Waksals were selling their ImClone stock.

### Specification Two

STEWART falsely stated that in a conversation that occurred sometime in November or December 2001, after she sold all of her ImClone shares from the Martha Stewart Defined Pension Fund, STEWART and BACANOVIC decided that STEWART would sell her shares when ImClone started trading at $60 per share.

### Specification Three

STEWART falsely stated that on December 27, 2001, at approximately 1:30 p.m. (EST), STEWART spoke to BACANOVIC, who told her that ImClone was trading below $60 per share and suggested that STEWART sell her ImClone shares.

(Title 18, United States Code, Sections 1001(a)(1) and (2)).

## COUNT FIVE

(Making and Using False Documents by Peter Bacanovic)

The Grand Jury further charges:

15. In or about January 2002, in the Southern District of New York and elsewhere, PETER BACANOVIC unlawfully, willfully, and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, made and used false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries, to wit, BACANOVIC altered the Worksheet to add the notation "@ 60" and caused it to be produced to the SEC.

(Title 18, United States Code, Sections 1001(a)(3) and 2).

## COUNT SIX

(Perjury by Peter Bacanovic)

The Grand Jury further charges:

16. On February 13, 2002, in the Southern District of New York, PETER BACANOVIC, having taken an oath before a competent tribunal, officer and person, in a case in which the law of the United States authorizes an oath to be administered, namely, in testimony before

an officer of the SEC, that he would testify, declare, depose and certify truly, and that any written testimony, declaration, deposition and certificate by him subscribed, would be true, unlawfully, willfully, knowingly, and contrary to such oath, stated and subscribed material matters which he did not believe to be true, namely, the testimony on or about February 13, 2002, the underlined portions of which he believed to be materially false:

### Specification One
(Page 14, Line 11—Page 16, Line 7)

Q: And she [MARTHA STEWART's assistant] told you that Ms. Stewart was in transit?

A: Ms. Stewart was in transit, that she didn't know when she would be speaking with her, and that she would try to give her the message.

Q: And what was the message?

A: *The message was to please call us back, and also to please advise her that ImClone stock was at whatever the price was at that time.*

. . .

Q: And you specifically told [MARTHA STEWART's assistant] that ImClone stock was dropping?

A: *No. We just gave her the price of the stock.*

. . .

Q: When you called [MARTHA STEWART's assistant], can you just try and think, to be as specific as possible, when you asked her to ask Ms. Stewart to please call you back, did you say, "It's urgent, call me back immediately"? Something like that?

A: *No. I said, "I would like to speak with her, if possible, today and regarding ImClone and the current price of the stock is.* Understanding that she is in transit and that she

sometimes is very, very difficult to reach."

### Specification Two
(Page 69, Line 2—Page 72, Line 4)

Q: When was the last time you saw her?

A: In January.

Q: When in January?

A: I would be able to give you the exact date, it's in my office in my calendar. I saw her approximately in the middle of the month.

. . .

Q: Did ImClone come up in the meeting at all?

A: *She had asked me if I had spoken to Sam, and I said, no, I had not. And that was it.*

. . .

Q: Did her investment in ImClone come up at all?

A: *No.*

. . .

Q: In addition to that meeting, have you talked to her at all since December 28th? Besides that meeting?

A: Well, I spoke with her about the fact that I wanted to schedule the meeting. I spoke with her to confirm that I had received the second part of the transfer. And then she—and I spoke with her when she reconfirmed that these payments were going to be going out.

Q: And when you spoke with her in any of these conversations, did ImClone come up?

A: *Did not.*

Q: Did Sam Waksal come up?

A: No. Oh—I don't recall. Possibly. I don't recall if Sam Waksal—we might have made reference to a newspaper article.

Q: What newspaper article?

A: There have been so many, I don't really remember. One of the earlier ones that began to appear.

Q: Do you remember what it was about the article that you guys were discussing?

A: Just the publicity.

Q: The publicity involving her?

A: No. There was no publicity, this was not about her, this is about Sam.

### Specification Three

(Page 77, Line 16—Page 82, Line 21)

Q: Did there come a time when she wanted to sell the ImClone stock?

A: Well, it was at my solicitation.

Q: Tell me about that.

A: When we were doing her portfolio review for tax planning purposes that took place in the week prior to Christmas, it came to me as a great surprise, having felt that I had liquidated all ImClone shares from her accounts at that time, that the stock was still there.

Q: Let me just—you had a tax planning discussion with her?

A: Which was also a portfolio review— a comprehensive portfolio review with her.

Q: And this happened the week before Christmas?

A: Correct.

Q: So, approximately?

A: I believe the exact date was December 20th, I believe.

Q: And where did this take place?

A: On the telephone. And we reviewed each and every position in the account. And we discussed the fundamentals of all the positions. We discussed gains and losses for all the positions. We discussed the overall status of the portfolio, and included in

that discussion was ImClone. And so we reviewed ImClone and discussed what her intentions were for ImClone at that time versus my recommendations.

Q: What were her desires for the ImClone stock?

A: She felt—that the time, the stock had already come off its highs a little bit. And she wanted to hold the stock, and I challenged that by saying, "The stock has [sic] clearly declining, why would you hold it? Why are you holding this, considering we sold 50,-000 or 40,000 shares two months ago?" ... And she goes—and at that point, we determined that if, in fact, it fell much further, then we would sell it.

. . .

Q: So, going back, she didn't really want to sell it, you recommended that she sell it. You can continue on from there.

A: So, we made a deal. I said, "Okay, if you would not like to sell the stock now, how long are you going to wait before you sell this stock?"

Q: I'm sorry, on December 20th, when you had this conversation, do you remember what the price of the stock was?

A: It was in the mid 60s. *And, at that point, we determined that $60 a share would be a suitable price, should it ever fall that low.* Of course, she never thought it would.

### Specification Four

(Page 104, Line 15—Page 105, Line 8)

Q: Did you ever tell Martha Stewart that the SEC had been speaking with Merrill Lynch about sales in ImClone at the end of the year?

A: *I said that we had had—we had been reviewing this internally. And that was all.*

Q: In other words, you didn't mention that the SEC was looking into this?

A: *No.*

Q: Tell me about the conversation you had with her when you said, "We've been reviewing this internally."

A: *I said, you know, "In light of the news, the disclosures and news and following the stock price, Merrill Lynch has been reviewing, you know, all our transactions in ImClone."*

Q: Did you tell her that anyone was asking questions about her transactions specifically?

A: *I did not.*

Q: Did she ask you that?

A: *She did not.*

(Page 124, Line 22—Page 125, Line 13)

Q: At any time, did you and she discuss the investigation—any investigation by the Securities and Exchange Commission?

A: *No.*

Q: Did you and she discuss any investigation by any entity at all into trading in ImClone stock or—

A: *I believe I said earlier that Merrill Lynch itself was investigating the situation with ImClone without making reference to any transaction or any person and obliquely just referring to the company.*

Q: Other than the Merrill Lynch investigation, did you and she discuss any other investigation into ImClone? ... Can you just say that out loud—

A: *No.*

Q: for the record?

A: *No, we did not.*

### Specification Five

(Page 106, Line 13—Page 107, Line 6)

Q: Did you say anything that would give her cause for concern, the fact that she sold on December 27th?

A: *No. Because she had no cause for concern. Because we had reviewed this position, I have notes of the conversation, it was completely typical, and she would have had no cause for concern. So, no.*

Q: And you have notes of what conversation?

A: *Well, I mean, I have a worksheet that I worked from that day, that we did on the 20th, where all of this stuff, which is a printout of a screen, with all sorts of markings on it. And so, I mean, all of this was discussed at the time, long prior. And so she had no reason for concern.*

Q: And the information about her selling—her possibly selling ImClone at 60 would be reflected on that worksheet?

A: *Yeah, I mean, reflected on the worksheet in a very loose way.* I mean, things are highlighted, marked for sales. Some things are circled. I mean, it's scribbled on.

### Specification Six

(Page 114, Line 10—Page 115, Line 3)

Q: Who came up with the $60 price for ImClone? To sell?

A: *We quibbled over it. And so we came to this price together.*

Q: What was the price you recommended? Did you recommend a price—?

A: I recommended an immediate sale.

Q: So you wanted her to sell about—

A: Right away.

Q: And what price did she come to you and say, "I'll sell it at."

A: *She didn't really have a price. I said, "Listen, what will you settle for? How low does this have to go before you're prepared to part with this?" She said, "I don't know." I said, "Well, how about $60 a share? Does that sound reasonable?" And the conversation was something like that. She said, "Yes, sure, $60."*

(Title 18, United States Code, Section 1621).

## COUNT SEVEN

(Obstruction of Justice by
Peter Bacanovic)

The Grand Jury further charges:

17. From in or about January 2002 through in or about April 2002, in the Southern District of New York and elsewhere, PETER BACANOVIC unlawfully, willfully and knowingly, corruptly influenced, obstructed and impeded, and endeavored to influence, obstruct and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, namely, the SEC, by providing and causing to be provided false and misleading information and documents to the SEC relating to the sale, of ImClone stock by MARTHA STEWART.

(Title 18, United States Code, Sections 1505 and 2).

## COUNT EIGHT

(Obstruction of Justice by
Martha Stewart)

The Grand Jury further charges:

18. From in or about January 2002 through in or about April 2002, in the Southern District of New York and elsewhere, MARTHA STEWART unlawfully, willfully and knowingly, corruptly influenced, obstructed and impeded, and endeavored to influence, obstruct and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, namely, the SEC, by providing and causing to be provided false and misleading information to the SEC relating to STEWART's sale of ImClone stock.

(Title 18, United States Code, Sections 1505 and 2).